SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

ALEXANDER EMMANUEL RODRIGUEZ,

Plaintiff,

v.

MAJOR LEAGUE BASEBALL, OFFICE OF
THE COMMISSIONER OF MAJOR
LEAGUE BASEBALL and ALLAN HUBER
"BUD" SELIG,

Defendants.

Index No.:

**SUMMONS**

---

TO THE ABOVE NAMED DEFENDANTS:

MAJOR LEAGUE BASEBALL
245 Park Avenue
New York, New York 10167

OFFICE OF THE COMMISSIONER OF
MAJOR LEAGUE BASEBALL
245 Park Avenue
New York, New York 10167

ALLAN HUBER "BUD" SELIG
c/o Office of the Commissioner of
Major League Baseball
245 Park Avenue
New York, New York 10167

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action, and to serve a copy of your answer on the Plaintiff's attorneys within twenty (20) days after the service of this summons, exclusive of the day of service, where service is made by delivery upon you personally within the State, or within thirty (30) days after completion of service where service is made in any other manner.  In case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: October 3, 2013
        New York, New York

REED SMITH LLP

By: _____
     Jordan W. Siev, Esq.
     James C. McCarroll, Esq.
     Casey D. Laffey, Esq.
     599 Lexington Avenue
     New York, New York 10022
     Tel: (212) 521-5400
     Fax: (212) 521-5450
              -and-

TACOPINA SEIGEL & TURANO, P.C.
By: Joseph Tacopina, Esq.
275 Madison Avenue
New York, New York 10016
Tel: (212) 227-8877

    -and-

GORDON & REES LLP
By: Wm. David Cornwell, Sr., Esq.
3455 Peachtree Road, Ste. 1500
Atlanta, Georgia 30326
Tel: (404) 869-9054

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| ALEXANDER EMMANUEL RODRIGUEZ, <br><br> Plaintiff, <br><br> v. <br><br> MAJOR LEAGUE BASEBALL, OFFICE OF THE COMMISSIONER OF MAJOR LEAGUE BASEBALL and ALLAN HUBER "BUD" SELIG, <br><br> Defendants. | **COMPLAINT** |

Plaintiff Alexander Emmanuel Rodriguez ("Plaintiff" or "Mr. Rodriguez"), by his

attorneys, Reed Smith LLP, Tacopina Seigel & Turano, P.C. and Gordon & Rees LLP,

alleges as follows:

### PRELIMINARY STATEMENT

1.      Major League Baseball ("MLB"), Commissioner Allan H. "Bud" Selig

("Commissioner Selig" or "Selig") and other officials at MLB (collectively, the

"Defendants") have – throughout at least all of 2013 – been engaged in tortious and

egregious conduct with one, and only one, goal:  to improperly marshal evidence that they

hope to use to destroy the reputation and career of Alex Rodriguez, one of the most

accomplished Major League Baseball players of all time.  Commissioner Selig and MLB

persistently have employed powers not available to them under the collectively-bargained

agreements between MLB and its union in order to make an example of Mr. Rodriguez, so

as to gloss over Commissioner Selig's past inaction and tacit approval of the use of

performance enhancing substances ("PES") in baseball (not to mention his multiple acts of collusion), and in an attempt to secure his legacy as the "savior" of America's pastime.

2.      For the past year, Defendants have been investigating Biogenesis of America, LLC ("Biogenesis"), a clinic in Coral Gables, Florida, that allegedly supplied a number of professional ballplayers with banned PES.  From the start of their investigation, Defendants have engaged in vigilante justice.  They have ignored the procedures set forth in baseball's collectively-bargained labor agreements; violated the strict confidentiality imposed by these agreements; paid individuals millions of dollars and made promises of future employment to individuals in order to get them to produce documents and to testify on MLB's behalf; bullied and intimidated those individuals who refused to cooperate with their witch hunt; and singled out Plaintiff for an unprecedented 211-game suspension – the longest non-permanent ban in baseball history.  Moreover, when Plaintiff sought to defend himself against Defendants' scorched earth investigation, Defendants falsely accused Plaintiff of interfering with their investigation by attempting to tamper with witnesses and evidence, and *increased* the length of his ban based on such spurious allegations.

3.      In a thinly-veiled attempt to circumvent the procedures set forth in the collectively-bargained agreements governing the relationship between MLB and the Major League Baseball Players Association ("MLBPA"), MLB unilaterally initiated a sham lawsuit against Biogenesis in state court in Miami, Florida, in order to obtain information about MLB players.  MLB continued seeking this "discovery" even after suspending Plaintiff and abusively procuring settlements with the other ballplayers, in a desperate attempt to gather evidence that will retroactively justify their unprecedented punishments.  This abuse of the court system seemingly reached its full expression when MLB conspired

2

with Biogenesis and its owner, Anthony Bosch, to drop their claims against Bosch –
currently under multiple criminal investigations for dispensing PES to minors – in
exchange for his cooperation.

4.      However, MLB was not finished.  Several weeks after imposing its
suspension on Mr. Rodriguez, and after his appeal of the suspension was lodged, it sought
to subpoena documents from his former attorneys, and his former public relations firm,
*solely* for use against him in the upcoming arbitration to resolve his appeal of MLB's
suspension.  Notably, each of these firms was hired by him *after* the events at issue in the
Biogenesis lawsuit took place.

5.      Moreover, Defendants have gratuitously violated the confidentiality
provisions of the collectively-bargained agreements in an effort to destroy Plaintiff's
reputation.  They have continuously leaked stories to the media concerning every step of
the investigation and discipline of Mr. Rodriguez, turning what is supposed to be a
confidential disciplinary and appeal process into a public trial of Mr. Rodriguez.
Commissioner Selig even went so far as to appear on David Letterman's national program
three weeks before Plaintiff's suspension was officially announced to discuss the
investigation and the financial consequences to Mr. Rodriguez of the punishment MLB
was going to impose.

6.      MLB's activities, including taking steps outside the labor process to collect
evidence through the Biogenesis case; continuing to collect such evidence even after
Plaintiff's suspension was announced; and incessantly leaking information related to its
investigation of Plaintiff to prejudice his appeal of his suspension, have deprived Plaintiff

of his right to a fair and impartial appeal of his suspension, and have interfered with his

ability to monetize both his lucrative agreement with the New York Yankees, and potential

endorsement deals.

7.     MLB thus is trampling Mr. Rodriguez's collectively-bargained rights – and,

indeed, those of every player in the league.  The time has come for this egregious

misconduct to stop, so current and future players may know that MLB cannot and will not

commit willful torts against them, and otherwise trample their rights with impunity.

8.     Plaintiff thus seeks compensatory and punitive damages from Defendants

as a result of such misconduct, which has interfered with his actual and prospective

contractual relationships with third parties, including the New York Yankees.

## JURISDICTION AND VENUE

9.     Pursuant to §§ 301 and 302 of the CPLR, this Court has personal

jurisdiction over Defendants because they are doing business in New York, the causes of

action asserted herein arise out of the transaction of business in New York, and the causes

of action asserted herein involve tortious conduct that took place in New York and/or that

caused injury in New York.

10.     Venue is proper in this Court pursuant to § 503 of the CPLR because MLB

maintains its principal office in this County.

## PARTIES

11.     Plaintiff, Alex Rodriguez, is an individual residing in Florida.

4

12.     Defendant Major League Baseball is an unincorporated association whose members are the 30 Major League Baseball Clubs.  MLB is headquartered at 245 Park Avenue, New York, New York, 10167.

13.     Defendant Office of the Commissioner of Baseball ("OCB") is an office created pursuant to the Major League Agreement entered into by the member clubs of Major League Baseball, and is located at 245 Park Avenue, New York, New York.  Upon information and belief, the OCB has the power to act for and bind Major League Baseball in business matters centralized in the league.

14.     Defendant Allan Huber "Bud" Selig is the Commissioner of Major League Baseball who, upon information and belief, resides in Milwaukee, Wisconsin.

## STATEMENT OF FACTS

### I.     BACKGROUND

#### A.     Alex Rodriguez and His Distinguished Career, Both On and Off the Baseball Diamond

15.     Alex Rodriguez is a professional baseball player who plays third base for the New York Yankees.  Well known by his nickname "A-Rod," he previously played shortstop for the Seattle Mariners and the Texas Rangers.

16.     Mr. Rodriguez is considered one of the most talented baseball players of all time.  Mr. Rodriguez is a 12-time All-Star, 3-time Most Valuable Player, and 10-time Silver Slugger Award winner.  He is the youngest player ever to hit 500 home runs, breaking the record Jimmie Foxx set in 1939.  He is also the youngest player to hit 600

home runs, surpassing Babe Ruth's record by over a year, and currently stands just 6 home

runs short of Willie Mays' career total of 660.  Mr. Rodriguez has had fourteen seasons of

over 100 runs batted in in his career, more than any other player in history.  Further, just

recently, he became the MLB career leader in grand slam homeruns.

17.     Mr. Rodriguez is also an active supporter and contributor to, among other

things, the Florida community.  For example, in 2003 Mr. Rodriguez donated $3.9 million

to the University of Miami to renovate its baseball stadium.  In 2007, Mr. Rodriguez

received the University of Miami's Edward T. Foote II Alumnus of Distinction Award,

three years after he was named an "honorary alumnus" of the University.  He is also a

member of the University of Miami's Board of Trustees and is active in other charitable

and non-profit activities.

**B.**     **The Disastrous Tenure of Commissioner Selig**

18.     Selig is the 9th and current Commissioner of Major League Baseball, having

served in that capacity since 1992.

19.     Prior to becoming the Commissioner, Selig was the owner of the

Milwaukee Brewers, one of the MLB teams.  As owner of the Brewers, Mr. Selig was part

of a scheme to collude with the other owners of Major League teams to keep ballplayers'

salaries down, and to enrich themselves.  From 1985-1987, Selig and the other owners

secretly agreed to limitations on the length and size of the contracts they would sign with

Major League ballplayers.  In 1986, this resulted in a 16% drop in the average free-agent

salary, while MLB reported revenue increases of 15%.  Selig and the owners were

ultimately caught, censured by then-acting commissioner Fay Vincent, and ordered to pay a $280 million fine to the players.

20.    Mr. Selig's tenure as Commissioner is as scandal-ridden as his term as owner, plagued by some of the most contentious and damaging failures in baseball history. For example, early in his tenure, Mr. Selig presided over the 1994-1995 strike, which resulted in the first cancellation of a World Series since 1904.  This 232 day strike caused substantial damage to baseball's reputation and resulted in long-lasting declines in game attendance and team revenue.

21.    More relevant to this action, however, is Commissioner Selig's dubious record concerning the use of PES by Major League ballplayers.  In the aftermath of the reputational harm suffered by MLB as a result of the 1994 strike, baseball was in desperate need of a way to reconnect fans with the game.  This salvation came in 1998, in the form of the highly public competition between two MLB players, Mark McGwire and Sammy Sosa, to break Roger Maris's record of hitting 61 home runs in one season.  Under the rapt attention of fans worldwide, both McGwire and Sosa beat Maris' record, hitting 71 and 66 home runs, respectively.

22.    Over the next few seasons, many of baseball's longest-held records were shattered.  In 2001, Barry Bonds broke the previous single season home run record by hitting 73 in one season.  Mr. Bonds followed that up in 2007 by breaking Hank Aaron's record for career home-runs, hitting 762.  The dramatic competitions involving Bonds, Sosa, and McGwire reignited fans' interest and passion in the game.  At the time, many

7

called this period the second "Golden Age of Baseball." Unfortunately, it appears to have been merely the "Golden Age of Steroids."

23.     In 2005, Jose Canseco, a former power hitter for the Oakland Athletics released his memoir, *Juiced*, in which he admitted to using steroids throughout his record-breaking career. He also named other MLB players that had allegedly used PES, including Mark McGwire. In the aftermath of Canseco's revelations, Congress launched an investigation into the use of PES by MLB players. Many top players were called to testify before Congress, including McGwire and Sosa.

24.     Under increasing pressure from fans and Congress, in 2006, Selig appointed former Senator George J. Mitchell to investigate the use of PES by MLB players. Senator Mitchell's report, released in 2007, found rampant use of banned substances throughout the game. Following the release of the Mitchell Report, Congressman Cliff Stearns called publicly for Selig to step down as Commissioner, citing his "glacial response" to the "growing stain on baseball." Many at the time speculated that Selig, known in the press as the "Steroids Commissioner," deliberately turned a blind eye to prolific steroid use because of the overwhelmingly positive publicity generated by the record-breaking competitions of McGwire, Sosa and Bonds.

25.     The Mitchell Report singled out Selig for criticism regarding his handling of PES usage in baseball. It observed, for example, that although MLB theoretically could impose up to a $2 million fine on clubs that failed to report PES use, at the time of the report, the Commissioner had never actually levied such a fine. The report concluded that "it is clear that baseball missed the early warning signs of a growing crisis."

8

26.     For the third time in his troubled tenure as owner and Commissioner, Selig had to reinvent himself.  In early 2013, such an opportunity presented itself in Southern Florida.

### C.     The Current Collective Bargaining Agreement

27.     MLBPA is the union that represents professional MLB players.  In 1968, it entered into the first collective bargaining agreement with MLB, which governs the terms and conditions of MLB players' employment.  The current agreement was entered into by MLB and MLBPA on December 12, 2011, and expires on December 1, 2016.

28.     In addition, MLBPA entered into a Joint Drug Prevention and Treatment Program with MLB, which seeks to deter the use of banned substances, including anabolic steroids and other PES, and to "provide for... an orderly, systematic, and cooperative resolution of any disputes that may arise concerning the existence, interpretation, or application" of the policy itself.

29.     Following the Mitchell report, MLB and MLBPA amended the Joint Drug Agreement to allow for a more rigorous system of testing and punishment for use of PES. Among the changes were: the expansion of surprise mandatory testing of ballplayers from one to two times a year, an increase in the number of substances tested for, to a total of eighty-five, and the enlargement of penalties from a ten-game suspension for first time users to fifty games, and from a thirty to a 100 game suspension for a second offense. These penalties for PES usage are among those that remain in effect today.

30.     In January 2013, the Joint Drug Agreement was once again amended, this time to allow for the use of in-season testing for human growth hormone, and other enhanced testing techniques.

31.     Recognizing that the confidentiality of player information is "essential to the Program's success," the Joint Drug Agreement prohibits MLB and MLBPA from disclosing information concerning the investigation or testing conducted, or discipline enacted pursuant to the JDA to "the public, the media or other Clubs." Moreover, the Joint Drug Agreement prohibits revealing "[a]ny and all information relating to a Player's involvement in the Program, including... the results of any Prohibited Substance testing to which the Player may be subject, and any discipline imposed upon the player." The only public disclosure permitted by the Joint Drug Agreement is the name of a player suspended pursuant to the agreement, and the term of the suspension.

## II.     THE BIOGENESIS MATTER

### A.     MLB's Investigation into Biogenesis and Anthony Bosch

32.     In January 2013, the *Miami New Times*, a free weekly tabloid, published documents provided to it by Porter Fischer, a disgruntled former employee of Biogenesis, an anti-aging clinic located in Coral Gables, Florida. The documents purportedly identified a number of MLB players who used the clinic to obtain human growth hormone and other PES. Mr. Fischer's stated purpose in releasing the documents was to embarrass the owner of the clinic, Anthony Bosch, who Fischer believed owed him some back pay and other monies. Among the players allegedly connected to Biogenesis was Alex Rodriguez.

10

33.     Upon information and belief, MLB had been investigating Biogenesis to little effect since the summer of 2012.  The *Miami New Times* publication, however, breathed new life into MLB's moribund inquiry.  Selig quickly jumped at the opportunity to vindicate his legacy by showing that he was tough on PES, and to harm Mr. Rodriguez.

34.     Although more than a dozen players were identified in the Biogenesis documents, two players quickly became the target of MLB's highly publicized investigation.  The first, Ryan Braun of Mr. Selig's former team, the Milwaukee Brewers, had previously avoided suspension under the Joint Drug Agreement by demonstrating that MLB had failed to maintain the proper chain-of-custody for urine samples taken from Braun.  The second player was Alex Rodriguez.  Taking down Mr. Rodriguez would vividly demonstrate that Commissioner Selig had learned from the errors of his previous explicit or tacit tolerance of steroid use.

35.     As discussed above, both the Basic Agreement and the Joint Drug Agreement provide safeguards to ensure the integrity and confidentiality of MLB investigations into banned substances.  These safeguards are necessary to protect players against the broad unilateral powers vested in MLB's commissioner.  Moreover, both the Basic Agreement and Joint Drug Agreement provide for procedural mechanisms which govern the collection and exchange of evidentiary material in the event of alleged PES use by an MLB player.

### B.     MLB's Suit Against Biogenesis

36.     Rather than invoking the procedures set forth in the Agreements, on March 22, 2013, MLB sued Bosch, Biogenesis and others in Miami-Dade County Circuit Court

11

(the "Biogenesis Suit"), in order to obtain discovery of the Biogenesis documents discussed in the *Miami New Times* article, among others. Although MLB alleged that the defendants in the Biogenesis Suit were tortiously interfering with the Basic Agreement and the Joint Drug Agreement, MLB's true purpose for the Biogenesis Suit was to circumvent the procedures in baseball's Agreements, and seek "evidence" that would allow MLB to publicly shame and ultimately suspend Mr. Rodriguez and other ballplayers.

37.     MLB's suit was immediately criticized by the sports and legal community as lacking merit, and for skirting the procedural safeguards concerning MLB investigations found in the Agreements. For example, one attorney affiliated with NBC Sports wrote that MLB's suit was:

> [A] transparent and cynical attempt by Major League Baseball to obtain documents to discipline its employees, not an attempt to vindicate an actual legal injury, and courts do not like to be used in such a fashion....
>
> They are now suing with the sole intent of getting documents. Which is problematic because the purpose of the legal system is to redress legal injury, not to be used as a cudgel in some employment dispute involving non-parties to the lawsuit or to help sports leagues with their public relations problems.[1]

38.     Similarly, a University of Georgia sports law professor opined in a Reuters article that he "doubt[s] Major League Baseball cares much about getting damages from these people ... It's about getting to the discovery."[2] A columnist for *Sports Illustrated*

---

[1] Craig Calcaterra, *Major League Baseball's lawsuit against Biogenesis should be laughed out of court*, NBC HARD TALK SPORTS, (Mar. 22, 2013), http://hardballtalk.nbcsports.com/2013/03/22/major-league-baseballs-lawsuit-against-biogenesis-should-be-laughed-out-of-court/.

[2] Joseph Ax, *Analysis: In suing clinic over drugs, U.S. baseball may be targeting players*, REUTERS, (Mar. 24, 2013), *available at*

called the Biogenesis Suit "a desperation move with little chance of success." Such statements regarding the true purpose of the Biogenesis Suit have proven accurate.

39.     Immediately after filing its complaint, MLB began aggressively pursuing discovery, serving subpoenas for documents and testimony on numerous parties and non-party witnesses, including Carlos Acevedo, Juan Carlos Nunez, Ricardo Martinez, Biokem LLC, Porter Fischer, Marcelo Albir, BioGenesis of America LLC, Anthony P. Bosch, RPO, LLC, Paulo da Silveira, AT&T, Federal Express and T-Mobile. This initial round of discovery was quickly followed up with additional discovery requests, served upon at least an additional eleven individuals and entities.

40.     The swift timing and extensive scope of the discovery sought by MLB demonstrates that a plan to obtain evidence was in place well before the filing of the complaint, confirming the true motive for the Biogenesis Suit.

41.     MLB's fervent quest for discovery did not stop with its initial subpoenas. MLB has relentlessly harassed individuals by cancelling and re-noticing depositions countless times. For example, Lazaro Collazo has been served with at least four notices and re-notices of subpoenas for videotaped deposition.

42.     Likewise, on August 1st MLB requested an emergency hearing to address Mr. Fischer's compliance with subpoenas for documents despite his not being represented by an attorney. Notably, this "emergency hearing" to compel production was requested to take place on August 2nd. The matter was preliminarily heard on August 8th, with a

---

http://articles.chicagotribune.com/2013-03-24/sports/sns-rt-us-usa-baseball-lawsuitbre92n0mw-20130324_1_biogenesis-florida-clinic-miami-new-times.

continued hearing taking place on August 21st, *after* MLB had imposed its discipline on Mr. Rodriguez and he had filed a grievance, thus highlighting that the only "emergency" was that MLB now faced an arbitration against Mr. Rodriguez where it would have to defend its unprecedented suspension.

43.     Not satisfied with the foregoing, on August 22nd, in a brazen attempt to breach Mr. Rodriguez's attorney-client privilege, and in a further attempt to gather evidence for the upcoming arbitration, MLB issued a Notice of Production from Non-Party to Black, Srebnick, Kornspan & Stumpf ("Black, Srebnick"), Mr. Rodriguez's former attorneys, seeking documents concerning their representation of Mr. Rodriguez.  Notably, such documents have no relevance to the Biogenesis Suit.  Similarly, MLB requested that a former public relations firm that was hired by Black, Srebnick provide documents that also have no relevance to the Biogenesis Suit.

44.     MLB's improper tactics were done solely with the intent of harming Mr. Rodriguez and interfering with his business relationships.  MLB acted tortiously and maliciously while attempting to amass evidence through the Biogenesis Suit, and continuing to collect such evidence after Mr. Rodriguez's suspension was announced, despite the fact that such evidence can have no bearing on MLB's prior decision to suspend Plaintiff.  MLB cannot use "evidence" that it gathers *after* the imposition of discipline to retroactively justify the discipline it previously imposed.  Similarly, MLB's continued requests for discovery after Mr. Rodriguez's suspension was announced, including the emergency motion and the August 22nd notice, can have no purpose other than to harass and embarrass Mr. Rodriguez and prevent him from performing his agreement with the New York Yankees and from obtaining endorsement deals.

14

**C.      MLB Engages in Improper Practices**
**        in Pursuing the Biogenesis Suit**

45.      MLB's improper tactics were not limited to subpoenas and motion practice,

but also included its scorched-earth approach to conducting an investigation.  On June 21,

the *New York Daily News* reported that the former University of Miami pitching coach

Lazaro (Lazer) Collazo, a defendant in the Biogenesis Suit, told the News that MLB

investigators intimidated him and his family at his Miami home in March seeking

information concerning their investigation.  Similar allegations were made by a lawyer

representing another defendant in the Biogenesis Suit, Carlos Acevedo.

46.      Although in its complaint, MLB claimed that it brought the Biogenesis Suit

to "preserve and enhance the integrity of the game and the image of baseball" (Biogenesis

Complaint ¶13), Defendants quickly demonstrated that such integrity did not extend to the

prosecution of their investigation.

47.      First, MLB obsessed over maintaining control over the flow of information

in the investigation, even at the expense of prosecuting those allegedly complicit in the

doping scheme.  For example, on June 10, 2013, attorneys for defendant Marcelo Albir

sought discovery of documents related to MLB's investigation of Biogenesis, as well as

depositions of MLB officials involved in the investigation.  Rather than reveal any facts

about its investigation – except those that they controlled through leaks to the media – the

Commissioner voluntarily dismissed his suit against Albir, who he previously alleged

distributed banned PES to MLB players (Biogenesis Complaint ¶ 31), thus demonstrating

that Defendants cared more about controlling the information concerning the investigation

than punishing those who allegedly enabled and facilitated violations of the Joint Drug Agreement.

48.     Second, while busily leaking reports to the media alleging that Mr. Rodriguez was interfering with their investigation, MLB officials were engaged in the very conduct they accused Mr. Rodriguez of perpetrating.  On April 11, 2013, the *New York Times* reported that MLB officials were offering cash payments to former Biogenesis employees in exchange for their testimony.  The *Times* also reported that MLB was paying a former Biogenesis employee for documentary evidence in the case.  One of the baseball sources quoted in the article attempted to justify MLB's conduct by noting that the payments would not exceed "several thousand dollars."

49.     On June 20, 2013, the *Miami New Times* interviewed Porter Fischer, the former Biogenesis employee.  In the interview, Fischer provided more details on MLB's attempt to coerce his testimony.  He told the *New Times* that MLB investigators offered him $1,000 per week salary as a consultant if he would cooperate, and on another occasion, offered him $125,000 for all the Biogenesis records he had, and an affidavit attesting to their authenticity.[3]

50.     In addition, Fischer filed a complaint with Boca Raton, Florida police regarding a March 24, 2013 theft of Biogenesis-related documents from his car.  In the police report, Fischer described several meetings with Ed Moldonado, Tom Riley and Dan Mullin – investigators employed by MLB – who offered him a job and up to $125,000 for

---

[3] Tim Elfrink, *MLB Steroid Scandal: How Porter Fischer Exposed the Coral Gables Clinic*, MIAMI NEW TIMES, (June 20, 2013), available at http://www.miaminewtimes.com/2013-06-20/news/mlb-steroids-alex-rodriguez/full/.

the client files prior to this incident.  Shortly after the theft, MLB stopped contacting Fischer about the documents.  Further, an investigator working for MLB – Kevin O'Rourke – also contacted the Boca Raton Police Department to inquire (without success) about the incident.

51.    Dan Mullin of MLB purchased what were represented to be these stolen documents for $150,000 in cash, which was handed off in a bag at a Fort Lauderdale, Florida area restaurant.  Upon information and belief, neither the recipient of the cash, nor MLB, filed the required IRS form 8300 for a cash transaction in excess of $10,000.  Failure to do so is a federal offense.  MLB's conduct may also fall under the Klein conspiracy theory of criminal liability.

52.    Mr. Mullin's actions should come as no surprise as – despite his role as an investigator for MLB in this matter – he engaged in an inappropriate sexual relationship with a witness whom he himself interviewed about the Biogenesis matter.

53.    Third, MLB's investigators harassed, intimidated and pressured individuals from whom they sought cooperation in MLB's investigation – which conduct sometimes was caught on audio or video tape –  including:

- Jorge Velasquez, the owner of Boca Body Rejuvenation Center.  From January through March 2013, MLB investigators harassed and threatened Mr. Velasquez at his home and place of business.  The investigators approached Mr. Velasquez's landlord, a doctor, and implied that Velasquez was under investigation by the state attorney, resulting in the landlord expelling Velasquez.

- Peter Carbone, the operator of a tanning salon.  Carbone was offered $200,000 to cooperate with MLB's investigation.  When Carbone refused the offer, they harassed and persecuted him, including by impersonating police officers and

17

forcing his car to the side of the road while he was driving, creating a highly
dangerous situation.

- Marcelo Albir, a former University of Miami ballplayer. MLB's counsel called
  Albir under false pretenses about an "internet posting," and also threatened
  Albir with a referral to law enforcement if Albir did not cooperate – an ethical
  violation for an attorney. Further, MLB's investigators harassed and threatened
  Albir, as well as his friends and family, including by misrepresenting their
  identities to the security guards at Albir's gated community, thereby improperly
  and unlawfully gaining access to Albir's neighborhood, confronting Albir's
  father at his office, impersonating Miami-Dade police officers to get Albir to
  open the door to his apartment, and misleading security guards at Albir's
  cousin's apartment building to gain access to his cousin's residence. As
  discussed above, MLB dropped its claims against Albir in an effort to avoid
  exposing its unethical tactics.

54.     MLB's ethically challenged behavior seemingly reached rock bottom in

their negotiations with Anthony Bosch, the alleged mastermind who controlled Biogenesis.

Multiple media outlets have reported that MLB negotiated with Bosch to drop its suit

against him in exchange for his full cooperation in providing evidence and testimony

against MLB players. In exchange for his assistance, MLB has also promised to provide

Bosch with personal security, pay his legal bills, and indemnify him for civil liability that

may arise from his cooperation. Moreover, according to at least one individual who claims

to have knowledge of Mr. Bosch's deal, MLB is paying Mr. Bosch a total of **$5 million** (in

monthly installments) in order to buy his cooperation.

55.     In addition, MLB has agreed to "put in a good word" for Mr. Bosch with

any law enforcement agencies as may be necessary. And it looks like Mr. Bosch will need

that as he – MLB's "star" witness – is now under investigation by both the U.S. Attorneys'

office in Miami and a Florida State attorney, for providing steroids to minors.[4] Indeed,

---

[4] Julie K. Brown, *Grand jury digs into MLB steroid use*, Miami Herald (August 16, 2013) available at
http://www.miamiherald.com/2013/08/16/3567784/grand-jury-digs-into-mlb-steroid.html#storylink=cpy

18

MLB *knew* that Bosch had many high school ballplayers as clients when it cut its deal with him as the stolen documents MLB purchased clearly noted a number of clients as being in high school.

56.     Such are the lengths that Commissioner Selig and MLB have stooped to in their witch hunt against Mr. Rodriguez – paying and protecting someone under investigation for providing steroids to minors.

## IV.    MLB'S RAMPANT LEAKING OF INFORMATION AND MISINFORMATION CONCERNING MR. RODRIGUEZ

57.     Without regard for the sanctity of the labor process, MLB and its agents tortiously and maliciously leaked information about their investigation into Mr. Rodriguez to multiple media outlets.  As a result, the play-by-play of MLB's investigation into Mr. Rodriguez and other players was reported on a daily basis in newspaper reports and media outlets around the country.  The leaked reports, either explicitly or implicitly attributed to MLB officials, include:

- **February 1, 2013:**  Several sources, speaking on the condition of anonymity, told ESPN that documents they reviewed detailed the drug regimens and schedules Mr. Rodriguez allegedly received.[5]
- **June 5, 2013:**  "Two baseball sources" told the *New York Daily News* that MLB was hoping to consummate a deal that would lead to a "100-game" suspension for Mr. Rodriguez.[6]
- **June 26, 2013:**  "[S]ources close to the ongoing drama" told the *New York Daily News* that Mr. Rodriguez intended to claim that he was physically unable to perform immediately after returning to the active roster so that he could collect his

---

[5] T.J. Quinn and Mike Fish, Sources: *Bosch injected A-Rod*, ESPN, (February 1, 2013), http://espn.go.com/espn/otl /story/_/id/8904501/operator-miami-clinic-linked-peds-mlb-treated-yankees-alex-rodriguez-directly.

[6] Bill Madden, *JUICE IS SPILLING MLB seeks to ban A-Rod & others with clinic founder near deal to share detail*, N.Y. DAILY NEWS, June 5, 2013, at Sports p. 56.

entire salary before MLB suspended him.  The source was quoted as saying: "It's all about him getting his money and not losing it to suspension."[7]

- **July 22, 2013:**  ESPN reported that "sources familiar with the investigation" said the evidence connecting Rodriguez to Biogenesis is "far beyond" what the league had against Braun.[8]

- **July 31, 2013**: A "person familiar with the discussions" told the Associated Press "on condition of anonymity because no statements were authorized" that MLB was "threatening to kick Mr. Rodriguez out of the game for life unless the New York Yankees star agrees not to fight a lengthy suspension for his role in the sport's latest drug scandal."[9]

- **August 4, 2013**:  Sources "familiar with baseball's investigation" told *Sports Illustrated* that MLB was prepared to announce Mr. Rodriguez's suspension for the remainder of this season and all of next season for multiple violations of both the Joint Drug Agreement and Basic Agreement.  They further noted that the planned suspension could effectively end Mr. Rodriguez's career.[10]

- **August 5, 2013:**  *New York Daily News* reporter Bill Madden appeared on a news show on SNY TV, stating that baseball sources told him that they did not seek a lifetime ban on Mr. Rodriguez because it would face a skeptical reception before the arbitrator, and because the 211-game ban would effectively end Mr. Rodriguez's career.

- **August 5, 2013:**  The Associated Press reported specific details of the "confidential" evidence MLB amassed against Plaintiff and the other suspended ballplayers, including, BlackBerry instant message transcripts, records of text messages, and Facebook profiles.[11]

- **August 19, 2013:**  In an interview with ESPN's Outside the Lines, TJ Quinn stated that he had "seen" and received descriptions of certain of MLB's alleged evidence concerning Mr. Rodriguez.

---

[7] Bill Madden, *Yankees' Alex Rodriguez planning to return and retire to collect fat salary before MLB suspension hits: sources*, N.Y. DAILY NEWS, (June 26, 2013), *available at* http://www.nydailynews.com/sports/i-team/sources-a-rod-hoping-cash-114-m-mlb-nails-article-1.1383664#ixzz2bxQjD689.

[8] Wallace Matthews, *Source: A-Rod tries to make deal with MLB*, ESPN, (July 22, 2013), http://espn.go.com/blog /new-york/yankees/post/_/id/60347/source-a-rod-trying-to-make-deal-with-mlb.

[9] Ronald Blum, *Person familiar with discussions: MLB threatening Rodriguez with lifetime ban in drug probe*, ASSOCIATED PRESS, (July 31, 2013), *available at* http://www.startribune.com/sports/twins/mlb/217708251.html.

[10] Tom Verducci, *Years of Mistrust Color MLB's Impending Suspension of Alex Rodriquez*, SPORTS ILLUSTRATED, (August 4, 2013), http://mlb.si.com/2013/08/04/alex-rodriguez-suspension-mlb-biogenesis-ped/.

[11] *Electronic trail helped MLB with bans*, ASSOCIATED PRESS, (Aug. 5, 2013), *available at* http://espn.go.com/mlb/story/_/id/9546552/mlb-built-biogenesis-case-facebook-texts-report-says.

- **September 1, 2013:** *New York Post* reporter Joel Sherman reported details of MLB's evidence obtained from Anthony Bosch, including the timing of alleged PES usage.[12]

58.     MLB's leaks were not limited to allegations concerning Mr. Rodriguez's

supposed PES use and the unprecedented – and wholly outrageous – suspension under the

Joint Drug Agreement.  In April 2013, media outlets started reporting (incorrectly) that Mr.

Rodriguez interfered with MLB's investigation by attempting to pay off witnesses and buy

and destroy incriminating documents.  The leaked reports, either explicitly or implicitly

attributed to MLB and its agents include:

- **April 12, 2013:** "Multiple baseball sources" told the *New York Daily News* that Mr. Rodriguez bought Biogenesis documents in order to keep them from MLB investigators.[13]
- **April 12, 2013:** Yahoo Sports reported that according to "two people briefed on the matter," investigators for Major League Baseball uncovered evidence that a representative of Alex Rodriguez purchased medical records from a person connected to Biogenesis.[14]

59.     One particularly egregious example of MLB's leaks was vividly

demonstrated on August 13, 2013, when *New York Daily News* columnist Bill Madden

appeared for an interview on WFAN's Mike Francesa Show.  Mr. Madden made many

assertions that he claimed were provided to him by "Baseball."  Mr. Madden's statements

---

[12] Joel Sherman, *2009 Words Get in the Way of A-Rod's 2013 PED Explanation*, N.Y. Post, (September 1, 2013) *available at*
http://www.nypost.com/p/sports/more_sports/words_get_in_way_of_rod_ped_explanation_PA0Qn88DiFS
IkUm1ryRztM/1.

[13] Bill Madden, *Sources: Alex Rodriguez bought Biogenesis documents as MLB probe into latest doping scandal intensifies*, N.Y. DAILY NEWS, (April 12, 2013), *available at*
http://www.nydailynews.com/sports/i-team/sources-a-rod-bought-biogenesis-documents-article-1.1315322
#ixzz2bs4HyThO.

[14] Mark Townsend, *Reports: Representatives for Alex Rodriguez purchased Biogenesis documents*, YAHOO SPORTS, (April 12, 2013),
http://sports.yahoo.com/blogs/mlb-big-league-stew/report-representatives-alex-rodriguez-purchased-biogen
esis-documents-222949996--mlb.html

clearly evidenced MLB's (*i.e.,* "Baseball's") efforts to smear Mr. Rodriguez at all costs –
efforts which, among other things, breach the BA and the JDA.

      60.    Indeed, throughout the interview, Madden discussed confidential details of
Mr. Rodriguez's investigation, punishment, and appeal.  When Francesa questioned
Madden about the veracity of his information, Madden emphasized that he had complete
access to MLB officials, and was getting his information directly from "Baseball."  The
confidential and/or defamatory information that MLB officials leaked to Madden, which
he then discussed on air, included statements that:

- MLB had the "most evidence" on Mr. Rodriguez of any ballplayer targeted by its investigation, covering "multiple violations of the drug agreement" which would "warrant a lifetime ban if [MLB] wanted to go strictly by the drug agreement."

- Baseball's "number one objective" was to ensure that Mr. Rodriguez "would never play" Major League Baseball again because he was the "number one offender of their drug policy."

- MLB had evidence that Mr. Rodriguez had been using performance enhancing substances "going back three or four years."

- "Bud Selig was so adamant that he did not want [Mr. Rodriguez] back on the field" that he was "willing to invoke the best interest of baseball" provision of the BA but chose not to do so in order to preserve his relationship with MLBPA.

- Many owners in baseball "wanted Bud to drop the hammer on [Mr. Rodriguez] and get him out of the game."

- Mr. Rodriguez was willing to accept a 100 game suspension and then retire, but MLB rejected that offer.  Madden's article in the *Daily News* the following day provided even more detail, quoting sources inside baseball as saying that "[a]t first [the 100 game deal] might have sounded compelling to MLB . . . But then the question of who would be paying him the guaranteed contract arose. Baseball couldn't saddle the Yankees with that."

- MLB is "frustrated with A-Rod's people" for attempting to drag out his appeals.

61.     Mr. Madden stated several times in the interview that the information he discussed was known only to MLB, and was provided to Madden by MLB officials.  MLB and Commissioner Selig engaged in, and continue to engage in, this gratuitous violation of Mr. Rodriguez's right to a confidential investigation and appeal in the hopes of currying favorable coverage in the press.  At least with respect to Mr. Madden, their strategy has succeeded, as reflected in a July 24th article in the *New York Daily News*, where Mr. Madden called Mr. Rodriguez the "most wanted criminal in the game's history" and even went so far as to compare Mr. Rodriguez to Whitey Bulger, a convicted murderer and organized crime figure.

62.     To exacerbate the harm caused to Mr. Rodriguez through their leaks, MLB and its agents tortiously and maliciously appeared on national media outlets to confirm and discuss the ongoing investigation into Mr. Rodriguez.

63.     For example, on July 15, 2013, three weeks before officially announcing Rodriguez's suspension, Bud Selig, the commissioner of MLB, appeared on David Letterman's nationally televised show to discuss MLB's investigation into Rodriguez. Selig confirmed that MLB was in the middle of a "very thorough and tough investigation" into Mr. Rodriguez.  In response to Mr. Letterman's question whether Mr. Rodriguez is "ever going to play for the Yankees again?", Selig coyly responded "[o]nly time will tell." Mr. Letterman then asked what the financial consequences of a potential suspension could be for Mr. Rodriguez, and Selig respond "Over one hundred million [dollars]."  When Mr. Letterman then asked for additional details concerning the planned suspensions, Selig demurred, but confirmed that he "knew" what they would be.

64.     MLB's incessant use of the media against Mr. Rodriguez reached new lows on August 19, 2013, when it ambushed Mr. Rodriguez's counsel, Joseph Tacopina, on live, national television with a letter offering to publicly release all confidential information regarding Mr. Rodriguez.  MLB's request effectively sought to amend or waive the confidentiality provisions of the JDA, yet MLB cut MLBPA (the players' exclusive bargaining representative) out of the process by neither copying MLBPA on the letter, nor sending it to MLBPA.  In a further demonstration of its bad faith, MLB did not send this letter to Mr. Rodriguez's counsel or Mr. Rodriguez.  Instead, this letter – which itself contained substantial confidential information concerning MLB's investigation of Mr. Rodriguez – was delivered *only* to the Today Show, and subsequently "released" by MLB to the *New York Times* and other media outlets.

65.     In addition, Rob Manfred, MLB's Executive Vice President, publicly attacked Mr. Rodriquez and requested permission to disseminate his medical records.[15]

66.     Indeed, MLB's public persecution of Mr. Rodriguez has known no bounds.  In addition to its substantial and repetitive breaches of confidentiality, upon information and belief, MLB went as far as to place negative news stories about Mr. Rodriguez – one of the league's best players – on his very own website, www.ARod.com, which is hosted by an affiliate of MLB.  Such news article were not removed from MLB's website until Mr. Rodriquez's management contacted MLB and requested that they be removed.

---

[15] *A-Rod's Lawyer, Yankees President Randy Levine Drop Verbal Gloves*, CBS New York, (August 17, 2013) available at
http://newyork.cbslocal.com/2013/08/17/a-rods-lawyer-yankees-president-randy-levine-drop-verbal-gloves
/

67. MLB officials tortiously and maliciously made statements to, and/or allowed leaks to be received by, the media in order to damage Mr. Rodriguez's public reputation and prevent him from performing his agreement with the New York Yankees. It believed that doing so would turn public opinion against Mr. Rodriguez, and strengthen their ability to impose a harsh punishment on him, consistent with Bud Selig's goal of cementing his legacy as the commissioner who cleaned up baseball.

## V.   MLB'S UNPRECEDENTED SUSPENSION OF MR. RODRIGUEZ

68. After months of public denouncement and speculation, on August 5, 2013, MLB suspended Mr. Rodriguez for 211 games, four times the length of the other thirteen players suspended in connection with the Biogenesis investigation, and the longest non-lifetime ban in baseball history. Only Pete Rose and the 1919 Chicago White Sox, who were, respectively, accused of betting on their own team and intentionally throwing the World Series, have received longer bans in modern baseball history.

69. Mr. Rodriguez's 211-game suspension is 161 games longer than the fifty-game suspension contemplated by the Joint Drug Agreement for a first-time violation of the current JDA. On August 6th, Mr. Rodriguez filed a grievance under the Basic Agreement, indicating his intent to appeal MLB's suspension.

## VI.   MLB'S TORTIOUS INTERFERENCE WITH PLAINTIFF'S BUSINESSES, CONTRACTS AND ENDORSEMENTS

70. Mr. Rodriguez has served as a spokesman for many of America's most venerable brands, including Pepsi, Nike, Wheaties and Colgate, and has appeared in numerous well-known print and television advertisements on their behalf. Such

25

endorsement contracts supplement a player's salary, and allow players to continue earning

an income even after they retire from the game.  Procuring these endorsement contracts

requires not only prodigious athletic talent, but also a sterling reputation.  Prominent

brands are quick to disassociate with an athlete at the first whiff of scandal, even if the

allegations are subsequently disproven.

71.     By publicly trying Mr. Rodriguez – whose investigation it is contractually

obligated to keep private – MLB has permanently harmed Mr. Rodriguez's reputation.  Its

gratuitous leaks and public statements concerning Mr. Rodriguez's alleged actions have

ensured that Mr. Rodriguez will not secure any endorsement contracts in the future.

72.     In fact, two potential sponsors – Nike and Toyota – have terminated

negotiations with Mr. Rodriguez for potential sponsorship contracts based on MLB's

continual leaks and accusations, all before Mr. Rodriguez has had his BA and JDA

provided arbitration hearing.

73.     Mr. Rodriguez also earns income from royalties associated with products

bearing his name, likeness and autograph.  Defendants' statements and actions have

tarnished Mr. Rodriguez's character, which has resulted, and will continue to result, in the

loss of income from these royalties.

74.     MLB's conduct has already had a deleterious effect on Mr. Rodriquez's

image and business relationships.  Among other things, Mr. Rodriquez was cast in the

animated movie "Henry & Me," which chronicles the Yankees' history and features team

stars from the past and present.  Mr. Rodriquez had already performed his own voice work

26

for his character as the team's hero.  However, due to MLB's public and harmful conduct, Mr. Rodriguez is being cut from the film.

75.     In addition to his endorsement contracts, Mr. Rodriguez owns a number of small businesses, including a construction company and a Mercedes-Benz dealership near Houston, Texas.  The principal asset of these businesses is their affiliation with Mr. Rodriguez, and as such, they rely on his good name and reputation.  MLB's public statements concerning Mr. Rodriguez's alleged PES use, and the cover-up of such use, have damaged Mr. Rodriguez's public standing, and as a result, interfered with Mr. Rodriguez's ability to run his businesses.

76.     Aside from negatively impacting Mr. Rodriguez's actual and prospective ability to secure endorsements and run his small businesses, MLB's conduct has interfered with his contract with his current employer, the New York Yankees.

77.     Thus, the imposition of an unprecedented 211-game suspension may cause Mr. Rodriguez to lose tens of millions of dollars in salary based on a faulty and prohibited investigation.

78.     Further, MLB's conduct could prevent Mr. Rodriguez from reaching certain performance-based milestones in his contract with the Yankees, each of which, standing alone, is worth $6 million to Plaintiff, up to a total of $30 million.

79.     In sum, the conduct of MLB has caused and continues to cause substantial damage to Mr. Rodriguez.

## CAUSES OF ACTION

<u>Count One – Tortious Interference with Prospective Business Relationships</u>

80.     Plaintiff restates and re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

81.     Plaintiff has served as the spokesman for many internationally known brands, including Nike, Pepsi, and Wheaties.

82.     Despite Defendants' knowledge that Plaintiff would lose the ability to secure future endorsement contracts if facts relating to MLB's investigation leaked out, Defendants willfully and maliciously leaked the details of its investigation to the media on an ongoing basis and falsely accused Plaintiff of attempting to tamper with their investigation.

83.     Moreover, Defendants intimidated witnesses who would be helpful to Plaintiff and provided cash payments to individuals who would provide evidence or testimony helpful to their case, making it more difficult for Plaintiff to vindicate himself in the face of their accusations.

84.     Defendants could have pursued their investigation lawfully pursuant to the procedures proscribed in the BA and JDA.  Following such a course of conduct would have minimized or eliminated the harm to Plaintiff.

85.     Instead, with the sole intent of harming Plaintiff's reputation, and his present and future business relationships, Defendants intentionally and maliciously chose to prejudicially try Plaintiff in the public arena.

28

86.     As a direct result of the Defendants' misconduct, at least two companies –
Nike and Toyota – have terminated negotiations with Mr. Rodriguez for potential
sponsorship contracts.

87.     Defendants are thus jointly and severally liable for the full amount of
damages caused to Plaintiff, plus costs and interest, in an amount to be determined at trial.

### Count Two – Tortious Interference with Existing Contracts

88.     Plaintiff restates and re-alleges the foregoing paragraphs of this Complaint
as if fully set forth herein.

89.     A valid contract exists between Plaintiff and the New York Yankees which
does not expire until 2017.

90.     Defendants, with knowledge of this valid agreement, intentionally and
improperly attempted to prevent Plaintiff from rendering full performance pursuant to that
agreement by, among other things:

    a.      Circumventing the procedures outlined in the collectively-bargained
            agreements between MLB and its union, and engaging in "vigilante justice"
            in their purported investigation into Plaintiff, including but not limited to,
            intimidating witnesses and providing cash payments to individuals who
            would provide them with evidence or testimony that would strengthen their
            case; and by

    b.      Continuously leaking to the press details of the confidential investigation
            into Plaintiff.

91.     Defendants then suspended Plaintiff for an unprecedented 211 games, 161
games longer than the fifty games permitted by the BA and JDA for a first offense.

29

92.     This unwarranted punishment was administered by MLB with the sole intent of interfering with Plaintiff's agreement with the Yankees.  Specifically, if upheld, the suspension will cost Plaintiffs tens of millions of dollars in salary and could prevent Plaintiff from meeting certain performance goals in his contract worth millions of dollars.

93.     Defendants could have pursued their investigation lawfully pursuant to the procedures proscribed in the collectively-bargained agreements.  Following such a course of conduct would have minimized the harm to Plaintiff.

94.     Instead, they maliciously chose to try Plaintiff in the public arena, and imposed a harsher ban than permitted by the labor process, with the sole intent of interfering with Plaintiff's contracts and harming Plaintiff.  Their conduct constitutes tortious inference with the contract between Plaintiff and the New York Yankees.

95.     Defendants are thus jointly and severally liable for the full amount of damages caused to Plaintiff, plus costs and interest, in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands the following relief from Defendants:

A.  An award of compensatory damages from Defendants in an amount to be determined at trial;

B.  An award of punitive damages from Defendants for their intentional and malicious misconduct in an amount to be determined at trial;

30

C.  An award of attorneys' fees, interest and costs, in an amount to be

    determined at trial; and

D.  Such other and further relief as the Court deems just, proper and equitable.

Dated: October 3, 2013
       New York, New York

**REED SMITH LLP**

By: _____
Jordan W. Siev, Esq.
James C. McCarroll, Esq.
Casey D. Laffey, Esq.
599 Lexington Avenue
New York, New York 10022
Tel: (212) 521-5400
Fax: (212) 521-5450

                    -and-

**TACOPINA SEIGEL & TURANO, P.C.**
By: Joseph Tacopina, Esq.
275 Madison Avenue
New York, New York 10016
Tel: (212) 227-8877

**GORDON & REES LLP**
By: Wm. David Cornwell, Sr., Esq.
3455 Peachtree Road, Suite 1500
Atlanta, GA 30326
Tel. (404) 869-9054
*Attorneys for Plaintiff*
*Alexander Emmanuel Rodriguez*