Joseph Baumgarten
Evandro C. Gigante
Kristine K. Huggins
Proskauer Rose LLP
Eleven Times Square
New York, New York 10036-8299
T: 212.969.3000
F: 212.969.2900
jbaumgarten@proskauer.com
egigante@proskauer.com
khuggins@proskauer.com
*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

ALEXANDER EMMANUEL RODRIGUEZ,

                          Plaintiff,                    13 Civ. 7097 (LGS)(KNF)

          vs.

MAJOR LEAGUE BASEBALL, OFFICE OF
THE COMMISSIONER OF MAJOR LEAGUE
BASEBALL and ALLAN HUBER "BUD"
SELIG,

                          Defendants.

_____


**DEFENDANTS' MEMORANDUM OF LAW
<u>IN SUPPORT OF MOTION TO DISMISS</u>**

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................................iii

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ................................................................................................4

    A.   The MLB/MLBPA Basic Agreement ..................................................................5

    B.   Plaintiff's Uniform Player's Contract ..................................................................6

    C.   The Joint Drug Agreement....................................................................................7

    D.   Plaintiff's Suspension and the Pending Arbitration Under the Basic Agreement and Joint Drug Agreement ..................................................................8

ARGUMENT ....................................................................................................................9

I.   LEGAL STANDARD .................................................................................................9

    A.   The Standard for a Motion to Dismiss ..................................................................9

    B.   The Standard for Section 301 Preemption ............................................................9

II.   PLAINTIFF'S COMPLAINT RELIES ON ALLEGATIONS THAT DEFENDANTS VIOLATED THE BASIC AGREEMENT AND THE JOINT DRUG AGREEMENT.............10

III.   PLAINTIFF'S CLAIMS ARE PREEMPTED BY SECTION 301 .........................................14

    A.   Section 301 Preempts Plaintiff's Claim for Tortious Interference with Existing Contract....................................................................................................14

    B.   Section 301 Preempts Plaintiff's Claim for Tortious Interference with Prospective Business Relationships........................................................................19

IV.   PLAINTIFF'S SECTION 301 CLAIMS SHOULD BE DISMISSED ...................................21

    A.   Plaintiff's Claims are Subject to Dismissal for Failure to Exhaust Contractual Remedies................................................................................................22

    B.   Plaintiff, in these Circumstances, Cannot State a Claim for Relief Based on a Claim of Tortious Interference with a Collective Bargaining Agreement under Section 301.............23

i

CONCLUSION................................................................................................................24

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allis-Chalmers Corp. v. Lueck,*
    471 U.S. 202 (1985) .................................................................................................................10, 12

*Amendolare v. Schenkers Int'l Forwarders, Inc.,*
    747 F. Supp. 162 (E.D.N.Y. 1990) ......................................................................................16

*Arnold v. Beth Abraham Health Servs.,*
    No. 09 Civ. 6049, 2009 WL 5171736 (S.D.N.Y. Dec. 30, 2009),
    *aff'd,* 420 F. App'x 48 (2d Cir. 2011) ....................................................................................15

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ...............................................................................................................9

*Atencio v. King Soopers,*
    11-cv-02195, 2012 WL 6043602 (D. Colo. Dec. 5, 2012) ....................................................22

*Beidleman v. Stroh Brewery Co.,*
    182 F.3d 225 (3d Cir. 1999) ..................................................................................................16

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ...............................................................................................................9

*Bill v. Casarona,*
    95 Civ. 2857, 1996 WL 389304 (S.D.N.Y. July 10, 1996) ..................................................16

*Boyum v. Horizon Condo.,*
    05 Civ. 4801, 2007 WL 576052 (S.D.N.Y. Feb. 21, 2007) .............................................16, 22

*Carvel Corp. v. Noonan,*
    350 F.3d 6 (2d Cir. 2003) ......................................................................................................19

*Caterpillar, Inc. v. Williams,*
    482 U.S. 386 (1987) ...............................................................................................................9

*Chube v. Exxon Chem. Am.,*
    760 F. Supp. 557 (M.D. La. 1991) .......................................................................................22

*Cincinnati Bengals, Inc. v. Abdullah,*
    No. 1:09-cv-738, 2010 WL 1904952 (S.D. Ohio Jan. 6, 2010) ............................................17

*DelCostello v. Int'l Bhd. of Teamsters,*
    462 U.S. 151 (1983) ...............................................................................................................22

*DiFolco v. MSNBC Cable, LLC*,
   622 F.3d 104(2d Cir. 2010)......................................................................................4

*Dougherty v. AT&T*,
   902 F.2d 201 (1990)..........................................................................................10, 22

*Dragone v. M.J. Raynes*,
   695 F. Supp. 720 (S.D.N.Y. 1988)...................................................................15, 17

*Dryer v. Los Angeles Rams*,
   40 Cal. 3d 406 (1985) .............................................................................................17

*Elec. Workers v. Hechler*,
   481 U.S. 852 (1987)................................................................................................10

*Foy v. Pratt & Whitney Grp.*,
   127 F.3d 229 (2d. Cir. 1997)..................................................................................10

*Granite Rock Co. v. Int'l Bhd. Of Teamsters*,
   130 S. Ct. 2847 (2010).........................................................................................4, 23

*Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*,
   50 N.Y.2d 183 (1980) .............................................................................................17

*Healey v. Int'l Bhd. of Elec. Workers*,
   No. 11-C-8892, 2012 WL 3835094 (N.D. Ill. Sept. 4, 2012)................................23

*Hines v. Anchor Motor Freight, Inc.*,
   424 U.S. 554 (1976)................................................................................................22

*Holmes v. Nat'l Football League*,
   939 F. Supp. 517 (N.D. Tex. 1996) .......................................................................20

*Jacque v. Frank Wirt*,
   05 CV-6197T, 2007 WL 748439 (W.D.N.Y. Mar. 7, 2007),
   *aff'd*, 377 F. App'x 50 (2d Cir. 2010)....................................................................15

*Kirch v. Liberty Media Corp.*,
   449 F.3d 388 (2d. Cir. 2006)........................................................................15, 17, 19

*Korthas v. N.E. Foods*,
   No. 5:03-CV-552, 2006 WL 519401 (N.D.N.Y. Feb. 27, 2006)............................16

*Lama Holding Co. v. Smith Barney Inc.*,
   88 N.Y.2d 413 (1996) .............................................................................................15

*Lingle v. Norge Div. of Magic Chef*,
    486 U.S. 399 (1988)............................................................................10

*Magerer v. John Sexton & Co.*,
    912 F.2d 525 (1st Cir. 1990)..........................................................16

*Maldonado v. Good Day Apartments, Inc.*,
    No. 12 Civ. 2017, 2013 WL 3465793 (S.D.N.Y. Jul. 9, 2013) ............11

*Mallgren v. Microsoft Corp.*,
    No. 12 Civ. 7517 (GBD)(JLC), 2013 WL 5495556, --- F. Supp. 2d ---- (S.D.N.Y.
    Oct. 3, 2013) ....................................................................................4, 9

*Metal Leathers Local 46 Pension Fund v. River Ave. Contracting Corp.*,
    No. 13 Civ. 234 (JSR), 2013 WL 3791409 (S.D.N.Y. Jul. 22, 2013) ....................8

*Milne Emps. Ass'n v. Sun Carriers, Inc.*,
    960 F.2d 1401 (9th Cir.1992) ......................................................16

*NLRB v. Drivers, Chauffeurs, Helpers, Local Union No. 639*,
    362 U.S. 274 (1960)..........................................................................23

*Pullman Co. v. Jenkins*,
    305 U.S. 534 (1939)..........................................................................11

*Riccio v. Prudential Ins. Co. of Am.*,
    No. 92-2195, 1992 WL 281159 (D.N.J. Sept. 21, 1992).................................16, 20

*Robbins v. George W. Prescott Publ'g Co.*,
    457 F. Supp. 915 (D. Mass. 1978)..........................................................22

*Rudnay v. Kansas City Chiefs Football*,
    No. 83-0476-CV-W-6, 1983 WL 2135 (W.D. Mo. Oct. 19, 1983) .......................17

*SEC v. Apuzzo*,
    689 F.3d 204 (2d Cir. 2012)..............................................................8

*Semper v. N.Y. Methodist Hosp.*,
    786 F. Supp. 2d 566 (E.D.N.Y. 2011) ..............................................10, 15

*Sherwin v. Indianapolis Colts, Inc.*,
    752 F. Supp. 1172 (N.D.N.Y. 1990).......................................................17

*Sprewell v. Golden State Warriors*,
    266 F.3d 979 (9th Cir. 2001) ..........................................................21

*Stratford Materials Corp. v. Jones*,
  499 N.Y.S.2d 172 (1986) ................................................................17

*Turner v. Am. Fed'n of Teachers Local 1565*,
  138 F.3d 878 (11th Cir. 1998) .......................................................16

*United Mine Workers of Am. v. Rag Am. Coal Co.*,
  392 F.3d 1233 (10th Cir. 2004) .....................................................16

*Vera v. Saks & Co.*,
  335 F.3d 109 (2d Cir. 2003) .....................................................10, 22

*Wall v. Constr. & Gen. Laborers' Union, Local 230*,
  224 F.3d 168 (2d Cir. 2000) ..........................................................16

## STATUTES

29 U.S.C. § 185(a) ("Section 301") ................................................ *passim*

## OTHER AUTHORITIES

Federal Rule of Civil Procedure 12(b)(6) .......................................4, 9

Federal Rule of Evidence 201(b) .......................................................8

Defendants respectfully submit this memorandum of law in support of their motion to dismiss the Complaint in its entirety.  Although Plaintiff's outrageous and ill-founded allegations are utterly without merit,[1] neither this Court nor the state court can or should adjudicate those claims on the merits.  Rather, as Plaintiff well knows, the claims belong in arbitration.

## PRELIMINARY STATEMENT

Plaintiff's claims that Defendants tortiously interfered with his existing and prospective contractual relationships are preempted by Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a) ("Section 301").  Once deemed preempted, those claims must be dismissed because: (i) Plaintiff has failed to exhaust his collectively-bargained remedies, and (ii) even if he had exhausted such remedies, Plaintiff cannot state a cause of action sounding in tort under Section 301 given the circumstances in this case.

Plaintiff Rodriguez is a professional baseball player employed by the New York Yankees ("Yankees").  He is also a member of the Major League Baseball Players Association ("MLBPA"), the exclusive collective bargaining representative for all professional Major League Baseball players.  As a member of the MLBPA, the terms and conditions of Plaintiff's employment are governed by several collectively-bargained agreements between Defendant Major League Baseball ("MLB") and the MLBPA, including the 2012-16 Basic Agreement (the "Basic Agreement"), the Joint Drug Prevention and Treatment Program (the "Joint Drug Agreement"), and Plaintiff's Uniform Player's Contract ("UPC") with the Yankees, the form of which is collectively-bargained and incorporated into the Basic Agreement.  With certain limited

---

[1] For purposes of this motion only, the facts alleged in the Complaint are assumed to be true.

exceptions not applicable here, these agreements require that disputes between a player and MLB

be resolved in accordance with the collectively negotiated grievance and arbitration procedure.

On August 5, 2013, MLB disciplined Plaintiff by suspending him for 211 games for

violating the Joint Drug Agreement and the Basic Agreement based on his use and possession of

performance enhancing substances ("PES"), and his efforts to obstruct MLB's investigation into

his use of PES.  Through his collective bargaining representative, the MLBPA, Plaintiff has

invoked the Basic Agreement's grievance and arbitration procedure in order to appeal that

suspension.  The parties are presently engaged in the arbitration of that grievance before an

Arbitration Panel.

Notwithstanding the pendency of his grievance and the Arbitration Panel's exclusive

jurisdiction to resolve Plaintiff's claims under the collectively-bargained agreements, Plaintiff

brings this lawsuit asserting that Defendants MLB, the Office of the Commissioner of Baseball,

and Commissioner Allan H. ("Bud") Selig (collectively, "Defendants") have, as a result of their

alleged conduct in violation of the collectively-bargained agreements, tortiously interfered with:

(i) his existing UPC with the Yankees; and (ii) his prospective business relationships.

Section 301 completely preempts both of Plaintiff's claims because, as pled, they are

inextricably intertwined with – indeed, utterly dependent upon – interpretation of the Basic

Agreement and the Joint Drug Agreement.  In fact, the Complaint is littered with allegations

making it evident that the essence of his claims consists of MLB's purported violations of its

collectively-bargained obligations.  In particular, Plaintiff states that Defendants:

- "ignored the procedures set forth in baseball's ***collectively-bargained labor
  agreements***";

2

- ▪ "circumvent[ed] the procedures set forth in the *collectively-bargained agreements* governing the relationship between MLB and the [MLBPA]";

- ▪ "violated the confidentiality provisions of *the collectively-bargained agreements*";

- ▪ took steps "outside the *labor process* to collect evidence"; and

- ▪ "trampl[ed] Mr. Rodriguez's *collectively-bargained rights*."

(*See* Docket No. 1 at 9, Summons and Complaint, dated October 3, 2013 (hereinafter referred to as "Compl.") at ¶¶ 2, 3, 5, 6, 7) (emphasis added).  Of the 95 paragraphs in the Complaint, 43 contain allegations that reference the collectively-bargained agreements or matters covered by those agreements at issue in the pending arbitration.

Plaintiff's repeated reliance on these collectively-bargained agreements is no accident. Though his claims sound in tort, the conduct complained of consists of actions alleged to violate the Basic Agreement, the UPC, and the Joint Drug Agreement.  Specifically, Plaintiff claims that MLB's investigatory tactics, its public comments and supposed "leaks," and its discipline of Plaintiff for obstructing the investigation of his conduct all violate the terms of the Basic Agreement and the Joint Drug Agreement.  Indeed, in a brazen attempt to circumvent the ongoing arbitration process, the Complaint actually seeks to have a court decide that the 211-game suspension was inappropriate (Compl. at ¶¶ 91-93) – precisely the grievance that is before the Arbitration Panel.  These claims cannot be resolved unless the Court interprets the collectively-bargained agreements.

Once preempted, Plaintiff's claims are subject to federal common law under Section 301 and should be dismissed for two independent reasons.  First, Plaintiff has failed to fully exhaust the mandatory grievance and arbitration procedures set forth in the Basic Agreement.  Second,

3

even assuming Plaintiff had exhausted his contractual remedies, under the circumstances presented here Plaintiff cannot state a cause of action for tortious interference under Section 301 as a matter of law.  *See Granite Rock Co. v. Int'l Bhd. Of Teamsters*, 130 S. Ct. 2847 (2010).

## STATEMENT OF FACTS

Defendant The Office of the Commissioner of Baseball, doing business as MLB, is a New York unincorporated association whose members are the 30 Major League Baseball Clubs (the "Clubs").[2]  (Compl. at ¶¶ 12, 13.)  Defendant Selig is the Commissioner of MLB.  (*Id*. at ¶ 14.)

Plaintiff Rodriguez is a professional baseball player employed by the Yankees, and as such he is a member of the collective bargaining unit represented by the MLBPA.  (*Id*. at ¶¶ 15, 27.)  As a member of the MLBPA, Plaintiff's terms and conditions of employment are governed by the collectively-bargained Basic Agreement between MLB and the MLBPA, his UPC with the Yankees (the form of which is negotiated and incorporated into the Basic Agreement), and the Joint Drug Agreement.[3]  (Baumgarten Exs. A–I.)

---

[2] "Major League Baseball," which Plaintiff has named as a defendant, is not an entity distinct from The Office of the Commissioner of Baseball (improperly named in the Complaint as "Office of the Commissioner of Major League Baseball").  Rather, The Office of the Commissioner of Baseball is an unincorporated association doing business as Major League Baseball.  Accordingly, the caption should be amended to reflect the proper names of Defendants, The Office of the Commissioner of Baseball d/b/a Major League Baseball and Allan Huber "Bud" Selig.

[3] Relevant portions of the Basic Agreement are attached to the accompanying Declaration of Joseph Baumgarten as Exs. A-F.  Relevant portions of Plaintiff's UPC, dated December 21, 2007 ("Rodriguez UPC"), are attached as Baumgarten Ex. G, and relevant portions of the current Joint Drug Agreement, effective December 12, 2011, are attached as Baumgarten Exs. H-I.  The Second Amended Complaint filed in *Office of Comm'r of Baseball v. Biogenesis of Am., LLC, et al.*, No. 13-10479 CA 20 (Fla. 11th Cir. Ct.) (hereinafter, the "Biogenesis Litigation"), referred to in the Complaint (*see, e.g.*, Compl. at ¶¶ 3, 36-44) is attached as Baumgarten Ex. J.  Because Plaintiff's Complaint specifically references these documents, the Court may appropriately consider them on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  *See Mallgren v. Microsoft Corp.*, No. 12 Civ. 7517 (GBD)(JLC), 2013 WL 5495556, at *4 n.3, --- F. Supp. 2d ---- (S.D.N.Y. Oct. 3, 2013) (*citing DiFolco v. MSNBC Cable, LLC*, 622 F.3d 104, 111(2d Cir. 2010)).

A.      **The MLB/MLBPA Basic Agreement.**

The Basic Agreement is a collectively-bargained agreement between the 30 Major

League Baseball Clubs (including the Yankees), MLB, and the MLBPA, the sole and exclusive

bargaining agent for all Major League Baseball Players (the "Players"), including Plaintiff.

(Compl. at ¶ 27; *see also* Baumgarten Exs. A, B.)

Among other things, the Basic Agreement sets forth a detailed grievance procedure

outlining the process by which disputes arising under the Basic Agreement must be resolved, as

well as provisions governing the discipline of Players.  (*See* Baumgarten Exs. D, F; *see also*

Compl. at ¶¶ 2, 35, 69, 72.)  The grievance procedure constitutes "the exclusive remedy of the

parties" to resolve certain grievances, and defines a "Grievance" (subject to certain exceptions)

as:

> [a] complaint which involves the existence or interpretation of, or
> compliance with any agreement, between the [MLBPA] and the
> Clubs or any of them, or between a Player and a Club . . . .

(Baumgarten Ex. D at Art. XI.A.1(a).)[4]

Under the Basic Agreement, all Grievances must be resolved through a multi-step

procedure, the final step of which is binding arbitration before an Arbitration Panel in

accordance with the Rules of Procedure set forth in Appendix A to the Basic Agreement

(hereinafter, the "Grievance Procedure").  (*Id.* at Art. XI.B.)  The Basic Agreement also grants

the Arbitration Panel the "jurisdiction and authority . . . to interpret or apply agreements or

---

[4] The only Grievances excepted from the Grievance Procedure are not relevant to this proceeding.  (*See* Baumgarten
Ex. D at Arts. XI.A.1(a)–(c); XI.C.)

provisions of agreements between the [MLBPA] and the Clubs or any of them, or between individual Players and Clubs." (*Id.* at Art. XI.C.)

In addition to establishing the mandatory Grievance Procedure, the Basic Agreement specifically addresses procedures relating to Player discipline. (*Id.* at Art. XII.) These provisions set forth a "just cause" standard for the imposition of discipline, as well as the remedies available to a Player in the event an Arbitration Panel determines that a Player has been disciplined without "just cause." (*Id.* at Art. XII.A-D.)

### B.    Plaintiff's Uniform Player's Contract.

Plaintiff is employed pursuant to the Basic Agreement and his UPC with the Yankees. (*See* Compl. at ¶¶ 15, 27; Baumgarten Ex. B at Preamble and Art. II, and Ex. G.) The Basic Agreement establishes a UPC that Players and Clubs are required to use as the form for an individual Player's contract. (*See* Baumgarten Ex. B at Arts. II, III.) The form UPC is collectively-bargained and incorporated into the Basic Agreement. (*See id.* at Art. III.) Although individual Players may negotiate certain terms of their employment with a Club (including, for example, salary over and above the collectively-bargained minimum), the terms of the Basic Agreement govern should there be an inconsistency between the Player's UPC and the Basic Agreement. (Baumgarten Ex. B at Art. III, and Ex. C at Art. VI.)

Plaintiff's contract with the Yankees comprises the form UPC and certain Special Covenants specific to Plaintiff's employment with the Yankees, which are deemed part of the UPC. (*See* Baumgarten Ex. G at 5, § II.1.) Consistent with the form UPC, Plaintiff's individual UPC: (1) incorporates the Grievance Procedure set forth in the Basic Agreement (*id.* at 3, § 9(b)); (2) provides that the UPC, the Basic Agreement, the Agreement regarding the Players'

6

Benefit Plan, and the Joint Drug Agreement, together "set forth all understandings and agreements between [the Club and the Player]" (*id.* at 4, "Supplemental Agreements"); and (3) states that "in the event any terms of this Contract is [sic] inconsistent with the terms of the Basic Agreement, the provisions of the Basic Agreement shall govern." (*Id.* at 14.)

### C.   The Joint Drug Agreement.

In recognition of the serious threat that PES and other prohibited substances pose to the health and safety of Players, and to the integrity and commercial success of Major League Baseball, MLB and the MLBPA collectively-bargained and established the Joint Drug Agreement, which applies to all Players, including Plaintiff. (*See* Compl. at ¶ 28; Baumgarten Ex. H at Preamble, and Ex. G at 4, "Supplemental Agreements.") The Joint Drug Agreement prohibits Players "from using, possessing, selling, facilitating the sale of, distributing, or facilitating the distribution of any Drug of Abuse, [PES] and/or Stimulant." (Baumgarten Ex. H at § 2.) The list of prohibited PES includes more than seventy substances, including testosterone and Human Growth Hormone (hGH). (*Id.* at § 2.B.) The Agreement also contains procedures governing Player discipline for violations (including violations involving the use of PES), confidentiality, disclosure of Player information, and arbitration of disputes, including disputes over Player violations of the Joint Drug Agreement. (Compl. at ¶¶ 28–31, 35, 64, 69, 72; Baumgarten Ex. H at Preamble, and Ex. I.)

With respect to dispute resolution, one of the Joint Drug Agreement's stated purposes is to "provide for, in keeping with the overall purposes of the Program, an orderly, systematic, and cooperative resolution of any disputes that may arise concerning the existence, interpretation, or application of this Program." (Compl. at ¶ 28; Baumgarten Ex. H at Preamble.) In that regard,

7

the Agreement requires that disputes "arising under the Program" be governed by and subject to the Grievance Procedure of the Basic Agreement.  (Baumgarten Ex. H at Preamble, and Ex. I at §§ 7, 8; Compl. at ¶ 72.)  In addition, the Joint Drug Agreement specifically provides that any dispute regarding the level of discipline imposed for a violation is subject to review by an Arbitration Panel.  (Baumgarten Ex. H at Preamble, and Ex. I at § 8.A.)

The Joint Drug Agreement also contains detailed rules as to what information may (and may not) be publicly disclosed and under what circumstances such information may be disclosed.  (Baumgarten Ex. I at § 6.A.; Compl. at ¶¶ 31, 35, 64.)

### D.  Plaintiff's Suspension and the Pending Arbitration Under the Basic Agreement and Joint Drug Agreement.

On August 5, 2013, MLB suspended Plaintiff for 211 games for his use and possession of numerous forms of PES in violation of the Joint Drug Agreement, and for his efforts to obstruct MLB's investigation into such conduct.  (Compl. at ¶¶ 58, 63, 68.)

In accordance with the Joint Drug Agreement and the Basic Agreement, Plaintiff's collective bargaining representative, the MLBPA, initiated a grievance pursuant to the Grievance Procedure contained in the Basic Agreement appealing Plaintiff's suspension.  (*See id.* at ¶¶ 4, 42, 43, 69, 72.)  That grievance has proceeded and MLB and the MLBPA are currently engaged in arbitration to resolve Plaintiff's appeal.[5]  (*Id.* at ¶¶ 69, 72.)

---

[5] *See* Jay Schreiber, *Rodriguez's Arbitration Case Resumes*, Bats: The New York Times Baseball Blog, Oct. 16, 2013, http://bats.blogs.nytimes.com/2013/10/16/rodriguezs-arbitration-case-resumes/?ref=baseball.  On a motion to dismiss, the Court may consider matters of which judicial notice may be taken.  *See Metal Leathers Local 46 Pension Fund v. River Ave. Contracting Corp.*, No. 13 Civ. 234 (JSR), 2013 WL 3791409, at *1 (S.D.N.Y. Jul. 22, 2013) (*citing SEC v. Apuzzo*, 689 F.3d 204, 207 (2d Cir. 2012)).  *See also* Federal Rule of Evidence 201(b) ("The Court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within

8

## ARGUMENT

Because resolution of Plaintiff's claims requires this Court to interpret the collectively-barbained agreements between MLB and the MLBPA, they are preempted by Section 301 and should be dismissed as a matter of law.

## I.  THE LEGAL STANDARD.

### A.  The Standard for a Motion to Dismiss.

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  On a motion to dismiss under Rule 12(b)(6), the Court may consider the allegations stated in the complaint, as well as documents incorporated into the complaint by reference, matters of which judicial notice may be taken, and "documents either in plaintiff's possession or of which plaintiff[] had knowledge and relied on in bringing suit."  *Mallgren*, 2013 WL 5495556, at *4 n.3 (citations omitted).

### B.  The Standard for Section 301 Preemption.

Section 301 of the Labor-Management Relations Act[6] governs "claims founded directly on rights created by collective bargaining agreements, and also claims 'substantially dependent

---

the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

[6] Section 301(a) provides that:

> [s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).

on analysis of a collective bargaining agreement.'" *Caterpillar, Inc. v. Williams*, 482 U.S. 386,

394 (1987) (*citing Elec. Workers v. Hechler*, 481 U.S. 852, 859 n.3 (1987); *Allis-Chalmers Corp.

v. Lueck*, 471 U.S. 202, 213, 220 (1985)); *see also Vera v. Saks & Co.*, 335 F.3d 109, 114 (2d

Cir. 2003). As the Supreme Court has held:

> [q]uestions relating to what the parties to a labor agreement agreed,
> and what legal consequences were intended to flow from breaches
> of that agreement, must be resolved by reference to uniform
> federal law, whether such questions arise in the context of a suit
> for breach of contract or in a suit alleging liability in tort.

*Allis-Chalmers*, 471 U.S. at 211.

Accordingly, "an application of state law is preempted by § 301 . . . only if such

application requires the interpretation of a collective-bargaining agreement." *Lingle v. Norge

Div. of Magic Chef*, 486 U.S. 399, 413 (1988).  *See also Allis-Chalmers*, 471 U.S. at 213

(holding that a tort claim is preempted if "evaluation of the tort claim is inextricably intertwined

with consideration of the terms of the labor contract"); *Dougherty v. AT&T*, 902 F.2d 201, 203

(1990) (holding that "[a]lthough plaintiffs formulate their complaint as based on state tort law,

that formulation is not binding upon us where rights and obligations under the pertinent

collective agreement are inextricably involved in the underlying claim").

## II.    PLAINTIFF'S COMPLAINT RELIES ON ALLEGATIONS THAT DEFENDANTS VIOLATED THE BASIC AGREEMENT AND THE JOINT DRUG AGREEMENT.

To determine whether Section 301 preemption applies, "courts first examine the elements

of the state-law claims at issue," *Semper v. N.Y. Methodist Hosp.*, 786 F. Supp. 2d 566, 583

(E.D.N.Y. 2011) (*citing Foy v. Pratt & Whitney Grp.*, 127 F.3d 229, 233 (2d. Cir. 1997)), and

the allegations as asserted in the complaint at the time of removal.  *See Vera*, 335 F.3d at 116

(*citing Pullman Co. v. Jenkins*, 305 U.S. 534, 537 (1939)); *see also Maldonado v. Good Day Apartments, Inc.*, No. 12 Civ. 2017, 2013 WL 3465793, at *6 (S.D.N.Y. Jul. 9, 2013).

Here, Plaintiff's Complaint purports to state two causes of action for tortious interference under New York law.  First, Plaintiff alleges that Defendants tortiously interfered with his prospective business relationships, including possible sponsorship opportunities with two companies by, *inter alia*, failing to "pursue[] their investigation lawfully pursuant to the procedures proscribed [sic] in the [Basic Agreement] and [Joint Drug Agreement]."  (Compl. at ¶ 84, and ¶¶ 70-83, 85–87.)  Second, Plaintiff alleges that Defendants tortiously interfered with his existing contract with the Yankees (the UPC) by, *inter alia*, "[c]ircumventing the procedures outlined in the collectively-bargained agreements between MLB and its union" and by suspending him "for an unprecedented 211 games, 161 games longer than the fifty games permitted by the BA and JDA for a first offense."[7]  (*Id*. at ¶¶ 90, 91; *see also* ¶¶ 44, 67, 76–78, 88–95.)

The claims as pled are inextricably intertwined with the collectively-bargained agreements, a conclusion that is immediately evident from the introductory paragraphs of the Complaint, which make clear that Plaintiff's tort theories are premised on allegations of conduct violating the collectively-bargained agreements:

- MLB "ignored the procedures set forth in baseball's collectively-bargained labor agreements; violated the strict confidentiality imposed by those agreements . . . and singled out Plaintiff for an unprecedented 211-game suspension" (Compl. at ¶ 2);

---

[7] According to Paragraph "93" of the Complaint, "Defendants could have pursued their investigation lawfully pursuant to the procedures proscribed [sic] in the collectively-bargained agreements.  Following such a course of conduct would have minimized the harm to Plaintiff." (Compl. at ¶ 93.)

- MLB's lawsuit against Biogenesis is an "attempt to circumvent the procedures set forth in the collectively-bargained agreements governing the relationship between MLB and the [MLBPA]"[8] (*Id*. at ¶ 3);

- MLB "violated the confidentiality provisions of the collectively-bargained agreements in an effort to destroy Plaintiff's reputation." (*Id*. at ¶ 5); and

- "MLB's activities, including taking steps outside the labor process to collect evidence . . . have deprived Plaintiff of his right to a fair and impartial appeal of his suspension, and have interfered with his . . . agreement with the New York Yankees and potential endorsement deals." (*Id*. at ¶ 6).

Proceeding onward, the Complaint repeatedly alleges that Defendants acted in violation of those agreements. (*See id*. at ¶¶ 1–3, 5–7, 27–31, 34–36, 44, 57–61, 63, 64, 66–69, 71, 72, 76–78, 82, 84, 89–94.) In fact, Plaintiff devotes an entire subsection of his Complaint to "[t]he Current Collective Bargaining Agreement," which contains a description of the contractual provisions that he alleges MLB has breached. (*See id*. at ¶¶ 27-31.)

While it may be possible in some instances for an employee to state tort claims that are independent of collectively-bargained rights and obligations, a careful review of *this* Complaint makes clear that the tort claims here are intertwined with the collectively-bargained agreements in precisely the manner contemplated by *Allis-Chalmers*. The allegations of "tortious and egregious" conduct (*id*. at ¶ 1) in fact consist overwhelmingly of claims that Defendants acted in violation of the Basic Agreement and the Joint Drug Agreement in the manner in which they collected and used evidence of Plaintiff's misconduct and in their statements that supposedly violated the collectively-bargained confidentiality requirements. Thus, for example, in introducing the section that condemns MLB's lawsuit against Biogenesis, the Complaint states:

---

[8] The Biogenesis Litigation, referred to in Plaintiff's Complaint, is a lawsuit commenced in Florida state court by the Office of the Commissioner of Baseball against Biogenesis of America, LLC and other strangers to the collective bargaining relationship between MLB and the MLBPA, asserting that defendants tortiously interfered with the Joint Drug Agreement by selling or distributing banned substances to MLB players. *See* Baumgarten Ex. J.

> [B]oth the Basic Agreement and the Joint Drug Agreement provide safeguards to ensure the integrity and confidentiality of MLB investigations into banned substances. These safeguards are necessary to protect players against the broad unilateral powers vested in MLB's commissioner. Moreover, both the Basic Agreement and the Joint Drug Agreement provide for procedural mechanisms which govern the collection and exchange of evidentiary material in the event of alleged PES use by an MLB player.

(*Id.* at ¶ 35.) In the paragraphs that follow, the Complaint expounds on the contention that the purpose of MLB's initiation and prosecution of the Biogenesis Litigation was (in Plaintiff's own words) "to circumvent the procedures in baseball's Agreements." (*Id.* at ¶ 36.) Clearly, the adjudication of this aspect of the Complaint would require a court to interpret and apply the Basic Agreement and the Joint Drug Agreement to determine what "procedural mechanisms" are – and are not – permitted.

Likewise, Paragraph "44" of the Complaint complains that MLB's "improper tactics" included its collection and use of evidence after Plaintiff's suspension was announced. According to the Complaint, "MLB cannot use 'evidence' that it gathers *after* the imposition of discipline to retroactively justify the discipline it previously imposed." (*Id.* at ¶ 44.) Yet, that is precisely a question that can – and must – be decided only by the Arbitration Panel under the "just cause" provisions of the Basic Agreement.

The next section of the Complaint – alleging "rampant leaking of information and misinformation concerning Mr. Rodriguez" (*id.* at p. 19) – likewise relies on claims that MLB violated the confidentiality provisions of the Basic Agreement and the Joint Drug Agreement, including the following allegations:

13

- "[w]ithout regard for the sanctity of the labor process, MLB and its agents tortiously and maliciously leaked the information about their investigation into Mr. Rodriguez to multiple media outlets." (*Id*. at ¶ 57.)

- "Mr. Madden's statements clearly evidenced MLB's (*i.e.*, "Baseball's") efforts to smear Mr. Rodriguez at all costs – efforts which, among other things, breach the [Basic Agreement] and the [Joint Drug Agreement]." (*Id*. at ¶ 59.)

- "MLB and Commissioner Selig engaged in, and continue to engage in, this gratuitous violation of Mr. Rodriguez's right to a confidential investigation and appeal . . . ." (*Id*. at ¶ 61.)

Notably, the Complaint would even have a court take over from the Arbitration Panel the task of determining the propriety of MLB's 211 game suspension of Plaintiff.  As is evident from Paragraphs "77" and "91" of the Complaint, Plaintiff seeks to have a court adjudicate that matter under the guise of a tort claim for intentional interference with his UPC – when, in fact, the propriety of the suspension depends entirely on the application of the Basic Agreement and the Joint Drug Agreement.

## III.   PLAINTIFF'S CLAIMS ARE PREEMPTED BY SECTION 301.

### A.   Section 301 Preempts Plaintiff's Claim for Tortious Interference with Existing Contract.

Section 301 preempts Plaintiff's claim for tortious interference with an existing contract because – as is apparent from the foregoing discussion – adjudicating this claim, *i.e.*, determining whether MLB interfered with Plaintiff's UPC, and did so "without justification," requires the Court to interpret collectively bargained agreements between MLB and the MLBPA.

To state a claim for tortious interference with contract under New York law, a plaintiff must assert: "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5)

14

damages resulting therefrom." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d. Cir. 2006) (*quoting Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996) (internal quotations marks omitted)).

Plaintiff's claim is preempted because: (1) determining whether Defendants, in fact, caused an actual breach of the UPC will require interpretation of the UPC, the form of which is itself a collectively-bargained agreement that is expressly incorporated into the Basic Agreement; and (2) determining whether Defendants' conduct was with, or without, justification will also require the Court to interpret the collectively bargained agreements between MLB and the MLBPA.

As discussed above, the claim as pled requires the Court to determine whether the UPC was breached and also the rights and limitations imposed upon the parties under the UPC and the other collectively-bargained agreements. Courts in this Circuit have repeatedly held that a claim of tortious interference in these circumstances is preempted because "any successful suit for tortious interference with a contract ultimately derives vitality from the contract itself. To determine whether a party has 'intentionally interfered with the performance' of the Agreement, [plaintiff] will be forced to elucidate what obligations were owed to him, an inquiry based on interpretation of the collective bargaining agreement." *Dragone v. M.J. Raynes*, 695 F. Supp. 720, 724 (S.D.N.Y. 1988).[9]  Indeed, we have not found a single case in this or any other circuit

---

[9] *See also Semper v. N.Y. Methodist Hosp.*, 786 F. Supp. 2d 566, 583-84 (E.D.N.Y. 2011) (holding that "[r]esolution of Plaintiff's tortious interference with contract claim is substantially dependent – if not utterly reliant – on the interpretation of the CBA, and is therefore preempted by Section 301 of the LMRA") (citations omitted); *Arnold v. Beth Abraham Health Servs.*, No. 09 Civ. 6049, 2009 WL 5171736, at *5 (S.D.N.Y. Dec. 30, 2009) (holding that "any tortious interference claim against the defendants must also be dismissed on preemption grounds, for such a claim would arise out of interference with the CBA and not any other contract"), *aff'd*, 420 F. App'x 48 (2d Cir. 2011); *Jacque v. Frank Wirt*, 05 CV-6197T, 2007 WL 748439, at *3 (W.D.N.Y. Mar. 7, 2007) (finding tortious interference with contract claim preempted where "[d]etermination of whether or not the employment contract (the

where a tortious interference claim against an employer based on a collective bargaining

agreement was held not preempted.[10]

That Plaintiff asserts Defendants interfered with his *individual UPC* with the Yankees (as

opposed to the Basic Agreement itself) does not alter this conclusion because the form UPC is

expressly part of, and subject to, the Basic Agreement.  *See Riccio v. Prudential Ins. Co. of Am.*,

No. 92-2195, 1992 WL 281159, at *2 (D.N.J. Sept. 21, 1992) (holding that where plaintiff's

individual "agency agreement's terms and conditions are subject to the CBA, the agency

agreement, like the CBA, is within the purview of section 301").  Indeed, courts have found that

preemption under Section 301 uniformly applies in professional sports where players claim that

---

CBA) was breached would require interpretation of that contract") (citation omitted), *aff'd*, 377 F. App'x 50 (2d Cir. 2010); *Boyum v. Horizon Condo.*, 05 Civ. 4801, 2007 WL 576052 (S.D.N.Y. Feb. 21, 2007) (holding that tortious interference with existing contract claim was preempted where defendants allegedly interfered with the collective bargaining agreement between Plaintiff's union and her employer); *Korthas v. N.E. Foods*, No. 5:03-CV-552, 2006 WL 519401, at *9 (N.D.N.Y. Feb. 27, 2006) (finding tortious interference with contract claims preempted where claims "would require interpretation of the CBA"); *Bill v. Casarona*, 95 Civ. 2857, 1996 WL 389304, at *3 (S.D.N.Y. July 10, 1996) (tortious interference with contract claim preempted where it centered around the alleged termination of plaintiff's employment without "just cause", which was "'substantially dependent' upon analysis of the CBA") (citation omitted); *Amendolare v. Schenkers Int'l Forwarders, Inc.*, 747 F. Supp. 162, 172 (E.D.N.Y. 1990) (preempting claims, including tortious interference with contract claim, where they "directly implicate the collective bargaining agreements entered into by the union and corporate defendants in this case").  *See also Wall v. Constr. & Gen. Laborers' Union, Local 230*, 224 F.3d 168, 178 (2d Cir. 2000) (holding tortious interference claims preempted where they would require interpretation of the union's constitution, which for preemption purposes, constitutes a labor contract under Section 301).

[10] *See also United Mine Workers of Am. v. Rag Am. Coal Co.*, 392 F.3d 1233, 1242-43 (10th Cir. 2004) (noting that "[o]ur own court and our companion circuits have consistently held that state-law tortious interference claims are preempted by § 301") (citations omitted); *Beidleman v. Stroh Brewery Co.*, 182 F.3d 225, 235 (3d Cir. 1999) (tortious interference claim preempted where plaintiff's allegations are "'inextricably intertwined' with consideration of the terms of the [collectively-bargained] agreement"); *Turner v. Am. Fed'n of Teachers Local 1565*, 138 F.3d 878, 884 (11th Cir. 1998) (tortious interference claim preempted because it "would require interpretation of the terms of the collective bargaining agreement") (footnote omitted); *Milne Emps. Ass'n v. Sun Carriers, Inc.*, 960 F.2d 1401, 1412 (9th Cir.1992) (holding that "[b]ecause the collective bargaining agreements address what types of disruption of the contractual or economic relationship between Milne and the employees are allowed . . . section 301 preempts the claims of interference with contractual relations and interference with prospective advantage") (citation omitted); *Magerer v. John Sexton & Co.*, 912 F.2d 525, 530-31 (1st Cir. 1990) (claim preempted where "determining whether Valley improperly interfered with plaintiff's employment contract requires an examination of the rights of plaintiff and Sexton under the collective bargaining agreement").

16

their standard player contracts have been violated, and such contracts are subject to, and made part of, a collective bargaining agreement.[11]

Additionally, and independently, the claim is preempted because the Court must also interpret the collectively-bargained agreements to determine whether Defendants procured a breach of Plaintiff's UPC "without justification." *Kirch*, 449 F.3d at 401-02 (quoting *Lama Holding Co.*, 88 N.Y.2d at 424).  *See Dragone*, 695 F. Supp. at 724 (holding claim preempted and noting that "while the courts have fashioned justifications for interference with contractual duties, those 'justifications' are based upon the rights created by the contract and the interests of the parties to that contract") (*citing Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183 (1980); *Stratford Materials Corp. v. Jones*, 499 N.Y.S.2d 172, 173 (1986)).  As discussed in Point II above, Plaintiff's allegations that Defendants acted "without justification" rest essentially on his claims that their conduct violated the Basic Agreement and the Joint Drug Agreement.

In his pre-motion letter, Plaintiff asserted that MLB's position here is inconsistent with the position it took in the Biogenesis Litigation.  Plaintiff's argument, however, ignores the critical differences between this case and the Biogenesis Litigation.  In the Biogenesis Litigation, the Office of the Commissioner of Baseball sued individuals and corporate entities who were *not*

---

[11] *See Cincinnati Bengals, Inc. v. Abdullah,* No. 1:09-cv-738, 2010 WL 1904952, at *7 (S.D. Ohio Jan. 6, 2010) (applying Section 301 where plaintiff's claims required interpretation of clauses contained in an individual player contract that was incorporated into the collective bargaining agreement); *Sherwin v. Indianapolis Colts, Inc.*, 752 F. Supp. 1172, 1177 (N.D.N.Y. 1990) (claims arising out of duties owed to a player under an individual contract that was "effectively incorporated by reference" into the CBA are preempted by Section 301); *Rudnay v. Kansas City Chiefs Football*, No. 83-0476-CV-W-6, 1983 WL 2135, at *2 (W.D. Mo. Oct. 19, 1983) (preempting claim where "resolution of plaintiff's rights and duties under his individual contract necessarily requires a determination of his rights and duties under the Collective Bargaining Agreement"); *Dryer v. Los Angeles Rams*, 40 Cal. 3d 406, 409-11 (1985) (applying Section 301 where plaintiff alleged a violation of his player contract, which was "drafted pursuant to a collective bargaining agreement between the players' union and NFL management").

*parties* to the collective bargaining relationship between MLB and the MLBPA.  *See* Baumgarten Ex. J.  The sole claim asserted in that case was that by selling, supplying, or otherwise making PES available to a number of Major League players, defendants induced and/or caused players to breach their obligations under the Joint Drug Agreement.  *Id.* at ¶¶ 43-49.

All of the defendants in the Biogenesis Litigation, unlike the Defendants here, were complete strangers to collective bargaining with MLB, such that MLB could address the tortious conduct only through a state law tort action, and not through any collectively-bargained grievance procedures or under the auspices of the National Labor Relations Board.  In contrast, Plaintiff not only has the right to seek relief for Defendants' alleged contractual violations under the grievance and arbitration provision of the collectively-bargained agreements, he is actively pursuing that right, and a number of grounds for the torts alleged in the Complaint arise directly out of that process.

Furthermore, in the Biogenesis Litigation there was nothing in the collectively-bargained Joint Drug Agreement for the Court to interpret because there was no dispute between the parties to that agreement concerning its terms.  Specifically, MLB and the MLBPA agreed that the use and possession of banned substances – such as those that had been provided to players by Biogenesis and other defendants – constituted a violation of the Joint Drug Agreement; thus, no interpretation of the Agreement was required to adjudicate MLB's claims against Biogenesis. *See* Baumgarten Ex. J at ¶ 20.  In this case, Plaintiff's cause of action is predicated on *disputed* contractual violations pending before the Arbitration Panel and requires extensive interpretation of the collectively-bargained agreements.

18

**B.     Section 301 Preempts Plaintiff's Claim for Tortious Interference with Prospective Business Relationships.**

Plaintiff's claim for tortious interference with prospective business relationships, as pled, also rests upon, and requires interpretation of, the collectively-bargained agreements.

To state a claim for tortious interference with prospective business relationships under New York law, a plaintiff must show that: "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship."  *Kirch*, 449 F.3d at 400 (*quoting Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003)).

Here, Plaintiff asserts that MLB acted dishonestly, unfairly, or improperly (to use the *Kirch* formulation) by collecting, using, and "leaking" evidence in violation of the Basic Agreement and the Joint Drug Agreement.  (*See* Compl. at ¶¶ 7, 8, 82, 83, 84.)  Without repeating the discussion above, Plaintiff's Complaint asserts that:

- "[b]y publicly trying Mr. Rodriguez – whose investigation it is *contractually obligated to keep private* – MLB has permanently harmed Mr. Rodriguez's reputation" (*id*. at ¶ 71) (emphasis added);

- Nike and Toyota terminated their discussions about potential endorsement deals with Plaintiff "based on MLB's continual leaks and accusations, all before Mr. Rodriguez has had his [Basic Agreement] and [Joint Drug Agreement] provided arbitration hearing" (*id.* at ¶ 72.); and

- Defendants' alleged "public" statements in violation of the collectively-bargained agreements have "interfered with [his] ability to run his businesses" (including a construction company and a car dealership near Houston, Texas), and have resulted in his removal from the cast of an animated motion picture.  (*Id*. at ¶¶ 74, 75.)

Furthermore, the Complaint alleges that Defendants:

19

- "willfully and maliciously leaked the details of its investigation to the media on an ongoing basis" (*id*. at ¶ 82);

- "intimidated" and compensated potential witnesses in connection with the ongoing arbitration "making it more difficult for Plaintiff to vindicate himself" (*id.* at ¶ 83); and

- failed to "pursue[] their investigation lawfully pursuant to the procedures proscribed in the [Basic Agreement] and [Joint Drug Agreement]." (*Id*. at ¶ 84).

Determining whether this conduct, as alleged in the Complaint, is malicious, unfair, or improper requires a court to interpret the Basic Agreement, the UPC, and the Joint Drug Agreement.  Specifically, a court will need to determine what is and is not permissible conduct under those contractual provisions, assess the facts as presented in light of the collectively-bargained provisions, and decide whether Defendants have, as alleged by Plaintiff, violated those provisions.[12]

Under these circumstances, the claim is preempted.  *See*, *e.g.*, *Holmes v. Nat'l Football League*, 939 F. Supp. 517, 527 (N.D. Tex. 1996) (finding that tort claims were preempted where "[t]o resolve these claims the court must perforce analyze the CBA and the collectively-bargained Drug Program to ascertain whether the Lions defrauded Holmes; or instead had the right to request that he submit to a pre-employment drug test"); *Riccio*, 1992 WL 28159, at *4 (holding that tortious interference with prospective business opportunity claim was preempted where, "in order to address this argument, it is necessary for the court to evaluate the terms and conditions of the . . . the CBA").

---

[12] Moreover, Section 3(c) of Plaintiff's UPC addresses Plaintiff's rights with respect to third-party sponsorship deals.  *See* Baumgarten Ex. H.  Therefore, to the extent the tortious interference with prospective business relationship claim asserts interference with Plaintiff's sponsorship opportunities, resolving such claim will also require interpretation of Section 3(c) of the UPC, the form of which is collectively bargained and incorporated into the Basic Agreement.  *See* Baumgarten Ex. E.

Contrary to Plaintiff's assertion in his pre-motion letter (and during the November 7, 2013 conference), the decision in *Sprewell v. Golden State Warriors*, 266 F.3d 979 (9th Cir. 2001), supports preemption here.  In *Sprewell*, plaintiff alleged tortious interference with contractual relations and prospective economic advantage as a result of defendants' alleged instigation of "a media campaign designed to portray Sprewell 'in a false and negative light."  *Id.* at 991.  The Ninth Circuit held that:

> to the extent Sprewell's interference claims are based upon alleged violations of the CBA, the district court properly dismissed those claims. That is, any allegation by Sprewell that the NBA's and the Warriors' alleged media communications were 'wrongful' because they violated the CBA would necessarily require an interpretation of that agreement, and thus would be preempted by section 301.

*Id.* (citation omitted).

Because Plaintiff's claims in *this* case are expressly "based upon alleged violations" of the Basic Agreement by Defendants, the claims "necessarily require an interpretation of [the Agreement], and thus would be preempted by section 301."  *Id.*

## IV.   PLAINTIFF'S SECTION 301 CLAIMS SHOULD BE DISMISSED.

Once preempted, and thus subject to federal common law under Section 301, Plaintiff's claims should be dismissed because: (1) Plaintiff has failed to exhaust the grievance and arbitration procedures set forth in the Basic Agreement; and (2) even if Plaintiff had exhausted his contractual remedies, he cannot, in these circumstances, state a federal cause of action for tortious interference under Section 301.

A.      **Plaintiff's Claims are Subject to Dismissal for Failure to Exhaust
Contractual Remedies.**

As the Second Circuit held in *Vera v. Saks & Co.*, 335 F.3d 109, 118 (2d Cir. 2003)
"[o]rdinarily . . ., an employee is required to attempt to exhaust any grievance or arbitration
remedies provided in the collective bargaining agreement" before filing suit in court.  *Id.*
(*quoting DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 163, (1983)); *Dougherty*, 902 F.2d
at 203 (holding that "[b]efore bringing such an action, the employee must exhaust grievance
procedures provided by the relevant collective bargaining agreement") (*citing Hines v. Anchor
Motor Freight, Inc.*, 424 U.S. 554, 563 (1976)).

Accordingly, courts routinely dismiss preempted claims due to plaintiffs' failures to
exhaust their remedies under a collective bargaining agreement *before* a lawsuit is commenced.
*See Vera*, 335 F.3d 109; *Dougherty*, 902 F.2d at 204; *Boyum*, 2007 WL 576052, at *10.  *See also
Atencio v. King Soopers*, 11-cv-02195, 2012 WL 6043602, at *5 (D. Colo. Dec. 5, 2012) (*citing
DelCostello*, 462 U.S. at 163-64; *Chube v. Exxon Chem. Am.*, 760 F. Supp. 557, 562 (M.D. La.
1991); *Robbins v. George W. Prescott Publ'g Co.*, 457 F. Supp. 915, 920 (D. Mass. 1978) (*citing
Vaca*, 386 U.S. at 184)).

Here, the Basic Agreement contains a mandatory grievance and arbitration procedure
which provides "the exclusive remedy" for the resolution of grievances, subject to certain
exceptions not applicable to this dispute.  (*See* Baumgarten Ex. D at Art. XI.A.1(a)–(c).)
Disputes arising under the Joint Drug Agreement and Plaintiff's UPC are also subject to the
grievance and arbitration provision of the Basic Agreement.  (Baumgarten Ex. H at Preamble.)
For these reasons, and because Plaintiff and MLB are currently engaged in arbitration to resolve
Plaintiff's appeal of his suspension, Plaintiff's claims should be dismissed for failure to exhaust.

22

**B.      Plaintiff, in these Circumstances, Cannot State a Claim for Relief Based on a Claim of Tortious Interference with a Collective Bargaining Agreement under Section 301.**

Assuming Plaintiff's claims are not dismissed for failure to exhaust, they should nevertheless be dismissed because Plaintiff cannot state a cause of action sounding in tort under Section 301 under the circumstances presented in this case.  In *Granite Rock Co. v. International Brotherhood Of Teamsters*, the Supreme Court expressly declined to recognize a federal cause of action under Section 301 for an international union's alleged tortious interference with a collective bargaining agreement.  The Court stated that "the balance federal statutes strike between employer and union relations in the collective-bargaining arena is carefully calibrated . . ., and as the parties' briefs illustrate, creating a federal common-law tort cause of action would require a host of policy choices that could easily upset this balance."  *Granite Rock Co.*, 130 S. Ct. at 2864 (citation omitted) (*quoting NLRB v. Drivers, Chauffeurs, Helpers, Local Union No. 639*, 362 U.S. 274, 289-90 (1960).  *See also Healey v. Int'l Bhd. of Elec. Workers*, No. 11-C-8892, 2012 WL 3835094, at *6 (N.D. Ill. Sept. 4, 2012) (following *Granite Rock* and dismissing Section 301 tortious interference claim).

Here, where the collective bargaining agreement clearly provides Plaintiff – through his collective bargaining representative – means of seeking redress against MLB (a factor that the Court in *Granite Rock* found critical to its decision), Plaintiff cannot state a cause of action for tortious interference under *Granite Rock* as a matter of law.  For this additional reason, Plaintiff's Section 301 claims should be dismissed.

23

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Court should grant Defendants' motion to dismiss

Plaintiff's Complaint with prejudice in its entirety.

Dated: November 8, 2013
     New York, New York                  PROSKAUER ROSE LLP

                              By:    s/ Joseph Baumgarten
                                      Joseph Baumgarten
                                      Evandro C. Gigante
                                      Kristine K. Huggins
                                      Eleven Times Square
                                      New York, New York 10036-8299
                                      T: (212) 969-3000
                                      F:  (212) 969-2900
                                      jbaumgarten@proskauer.com
                                      egigante@proskauer.com
                                      khuggins@proskauer.com
                                      *Attorneys for Defendants*

24